**Joel H. MONTGOMERY, Plaintiff-Appellant,**

v.

**SOUTHERN ELECTRIC STEEL COMPANY et al., Defendants-Appellees.**

**No. 26464.**

United States Court of Appeals Fifth Circuit.
April 16, 1969.

Macon L. Weaver, U. S. Atty., Birmingham, Ala., Charles Nice, Asst. U. S. Atty., Alan D. Rosenthal, Daniel Joseph, Attys., Dept. of Justice, Washington, D. C., Edwin L. Weisl, Jr., Asst. Atty. Gen., for plaintiff-appellant.

John J. Coleman, Jr., Warren B. Lightfoot, Bradley, Arant, Rose & White, Birmingham, Ala., for appellee, American Southern Steel Co.

Jerome A. Cooper, Benjamin L. Erdreich, Birmingham, Ala., Michael Gottesman, Washington, D. C., Cooper, Mitch & Crawford, Birmingham, Ala., for appellees, United Steelworkers of America, AFL–CIO and Local Union No. 5388; Bernard Kleiman, Pittsburgh, Pa., of counsel.

Before RIVES, BELL and DYER, Circuit Judges.

RIVES, Circuit Judge:

Joel H. Montgomery, a discharged ex-serviceman and former Southern Electric Steel Company employee, appeals from an adverse final judgment dismissing his seniority rights claim asserted under Section 9 of the Military Selective Service Act, as amended, 50 U.S.C. App. § 459 (1968).[1] We reverse and remand with instructions.

The district court heard this case on the pleadings, the interrogatories and answers thereto, and the stipulation of the parties. The stipulation disclosed the following facts. Montgomery was employed by the Company on May 27, 1962, as a probationary employee assigned to the "extra board" crew.[2] Pursuant to the collective bargaining agreement, probationary status continues for the first 240 hours of actual work; and, during this period, a probationary employee may be unilaterally discharged by the Company for any reason at all.[3] The Company has exercised the unilateral discharge prerogative with respect to approximately ten percent of all probationary employees.

Montgomery departed for military duty on July 15, 1962, after having completed 184 hours (76.6 percent) of his probationary period as an "extra board" employee. Before his departure for military service, he never held the "pan job" slot in the rolling mill department.[4] He, therefore, accrued only "extra board" seniority. At the time of his departure,

---

1. Upon a pre-trial motion by the Company, the United Steelworkers of America, AFL-CIO, and its Local 5388 were joined as parties defendant by virtue of the existence of a collective bargaining agreement between the defendants which governed seniority rights of Company employees, including Montgomery. Fed.R. Civ.P. 19.

2. "Extra board" employees, including both probationary employees and those who have completed the 240 hours probationary period, comprise entry level employees from whom are drawn on a bid offering basis manpower to be assigned to one of nine separate departments. Extra board seniority does not transfer as departmental seniority. Departmental seniority commences on the date an employee is withdrawn from the extra board and assigned to a department.

3. Nonprobationary employees are protected from unilateral discharge by the just cause provisions of Article V and the grievance arbitration rights of Article XX of the collective bargaining agreement.

4. The "pan job" is the lowest paid entry level position in the rolling mill department; it is an unskilled job requiring only physical strength to perform the work but requiring no unusual agility.

Montgomery had not been disciplined, nor had he received any adverse comment about his work.

Upon his return from military service on June 4, 1964, Montgomery resumed his duties on the "extra board" and completed his 240-hour probationary period ten days later. During Montgomery's absence for military duty, five departmental vacancies occurred in the mill, the first on October 8, 1962. Each vacancy was filled as a "pan job" by an "extra board" employee with less plant-wide seniority than Montgomery.[5] In each case, the employee who was accepted for the job was the employee with the earliest "extra board" (plant-wide) seniority date, a determination solely dependent upon "continuous service." A seniority list attached to answers to interrogatories indicates that jobs were posted for bidding on at least 32 occasions. In most instances, there were several bidders. In no instance has an employee with less plant-wide seniority ever been selected over a senior "extra board" employee for a mill department job.[6] Montgomery was admittedly physically and mentally qualified to perform the "pan job." The next time a "pan job" became available was October 24, 1966, over two years aft-

er Montgomery returned from military service. Montgomery was assigned a departmental seniority date commencing on October 24, 1966.

Montgomery contends that Section 9 of the Act requires the Company to grant him retroactive departmental seniority to commence with the October 8, 1962 date on which the first vacancy was filled after his departure, and for which position he would have been selected on the basis of his plant-wide seniority but for his absence in military service. The district court held that the Company's unilateral prerogative to fire for no reason any probationary employee, a power exercised as to one of every ten such employees, constituted sufficient "managerial discretion" to abrogate Montgomery's Section 9 rights, according to Tilton v. Missouri Pacific R. R., 1964, 376 U.S. 169, 180, 84 S.Ct. 595, 11 L.Ed.2d 590, since the existence of this unilateral power precluded Montgomery from establishing that "his probationary status was dependent solely upon continuing employment." The district court erred as a matter of law.

The language and intent of Section 9 of the Act[7] are clear and unequivocal.

---

5. Vacancies were filled by bid offering procedure. Notice of a "pan job" was posted in the plant and all interested employees bid in writing for the job. Employees Rich, Taylor, Rogers, Dodd and Charles Montgomery filled the vacancies in the order in which they are listed. Rich and Taylor were probationary employees at the time. All five employees gained departmental seniority on Montgomery.

6. This actual practice would appear to render meaningless the general promotion criteria included in Article VI of the collective bargaining agreement listing in order as promotion factors (a) ability to perform the work, (b) physical fitness and continuous service. This provision, heavily relied upon by the Union in this case, indicates that continuous service shall be the determining factor for promotion only where (a) and (b) are "relatively equal."

7. "(b) (B) if such position [left for military service] was in the employ of a private employer, such person shall—

(i) if still qualified to perform the duties of such position, be restored by such employer * * * to such position or to a position of like seniority, status, and pay; * * *

"(C) (1) Any person who is restored to a position in accordance with the provisions of paragraph * * * (B) of subsection (b) * * * shall be considered as having been on furlough or leave of absence during his period of training and service in the armed forces, shall be so restored without loss of seniority * * *.

"(c) (2) It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph * * * (B) of subsection (b) * * * should be so restored in such a manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment." 50 U.S.C. App. § 459.

The Company and the Union contend that the unilateral right to discharge probationary employees necessitates sufficient exercise of managerial discretion[8] to preclude Montgomery's rights under the Act, in accordance with McKinney v. Missouri-Kansas-Texas R. R. Co., 1958, 357 U.S. 265, 271–272, 78 S.Ct. 1222, 2 L.Ed.2d 1305. Such a defense simply ignores the factual realities of Montgomery's case and altogether misinterprets the principles of the Act as interpreted by the Supreme Court.

In Fishgold v. Sullivan Drydock & Repair Corp., 1946, 328 U.S. 275, 284–285, 66 S.Ct. 1105, 90 L.Ed. 1230 and Oakley v. Louisville & N. R. Co., 1949, 338 U.S. 278, 283, 70 S.Ct. 119, 94 L.Ed. 87, the Supreme Court interpreted Section 9(c) (1), 50 U.S.C. App. § 459(c) (1), to mean that a returning veteran does not step back at the exact same point he left; but rather he is entitled to "a position which, on the moving escalator of terms and conditions affecting that particular employment, would be comparable to the position which he would have held if he had remained continuously in his civilian employment." 338 U.S. at 283, 70 S.Ct. at 122. By congressional amendment, this "escalator principle" was expressly incorporated in the Act as Section 9(c) (2), 50 U.S.C. App. § 459(c) (2).[9]

Most recently, in Tilton v. Missouri Pacific R. Co., supra, the Supreme Court explained its McKinney managerial discretion standard and established a "foresight-hindsight" test to determine whether the Act applies in a specific, realistic re-employment context. The Supreme Court stated:

"Properly read, therefore, McKinney holds that where advancement depends on an employer's discretionary choice not exercised prior to entry into service, a returning veteran cannot show within the reasonable certainty required by the Act that he would have enjoyed advancement simply by virtue of continuing employment during the time he was in military service.

"It would be virtually impossible for a veteran to show, as the Court of Appeals would require, that it was absolutely certain, 'as a matter of foresight' when he entered military service, that all circumstances essential to obtaining an advancement in status would later occur. To exact such certainty as a condition for insuring a veteran's seniority rights would render these statutorily protected rights without real meaning. As Benjamin Franklin observed, 'In this world nothing is certain but death and taxes.' In every veteran seniority case the possibility exists that work of the particular type might not have been available; that the veteran would not have worked satisfactorily during the period of his absence; that he might not have elected to accept the higher position; or that sickness might have prevented him from continuing his employment. In light of the purpose and history of this statute, however, we cannot assume that Congress intended possibilities of this sort to defeat the veteran's seniority rights. 'This legislation,' the Court said in Fishgold v. Sullivan Drydock & Repair Corp., supra, at 285 [66 S.Ct. 1105, at 1111, 90 L.Ed. 1230], 'is to be liberally construed for the benefit of those who left private life to serve their country * * *.' So construed, we conclude that Congress intended a reemployed veteran who, upon returning from military service, satisfactorily completes his interrupted training, to enjoy the seniority status which he would have acquired by vir-

---

8. In light of a policy of "regularly" discharging ten percent of all probationary employees, the decision *not to discharge* is argued to be an exercise of managerial discretion sufficient to preclude Montgomery from showing that his job progression was dependent solely upon continuous service.

9. Selective Service Act of 1948, ch. 625, Tit. I, § 9, 62 Stat. 614. *See* 2 U.S.Code Cong. Service, pp. 1989, 2004, (1948). *See also* McKinney v. Missouri-Kansas-Texas R. R. Co., *supra*.

tue of continued employment but for his absence in military service. This requirement is met if, as a matter of foresight, it was reasonably certain that advancement would have occurred, and if, as a matter of hindsight, it did in fact occur."

376 U.S. at 180–181, 84 S.Ct. at 602. *Accord*: Hatton v. Tabard Press Corp., 2 Cir. 1969, 406 F.2d 593, *reversing* S.D. N.Y.1967, 267 F.Supp. 447. *See generally* Note, Veterans Reemployment Rights under the Universal Military Training and Service Act—Seniority Provisions, 1 Ga.L.Rev. 293 (1967).

From the foregoing examination of the language, intent and interpretation of Section 9 of the Act, it is clear that the district court erroneously imposed upon Montgomery the impossible burden that *Tilton* condemned. The parties stipulated, the collective bargaining agreement and the possibilities that the pan job may not have been bid for by Montgomery to the contrary notwithstanding, that but for his service absence Montgomery would have been given the pan job on October 8, 1962, as the employee then enjoying the most "plant-wide" seniority. The unilateral right to discharge probationary employees, even though "regularly" exercised ten percent of the time, was never an *affirmative* discretionary factor in management's advancement selection criteria. *McKinney* is, therefore, inapposite. And applying the "foresight-hindsight" standard of *Tilton*, Montgomery admittedly would have received the "pan job" on October 8, 1962 by virtue of no more than continuous service but for his military duty absence; he actually was promoted to the first available rolling mill departmental position after his re-employment (over two years after completion of his probationary status). He was entitled to seniority rights retro-actively awarded and antedating the five "pan men" who, though junior to him in "plant-wide" seniority (applying the "escalator principle"), were promoted to rolling mill departmental positions he would have been eligible to fill but for his military service absence.

The judgment of the district court is, therefore, reversed and remanded with directions to enter judgment for Montgomery awarding him departmental seniority effective October 8, 1962 and a position on the seniority list immediately before Homer Gerald Rich.

Reversed and remanded with directions.