Roy Paul **POMRENING**, Plaintiff-Appellant,

v.

**UNITED AIR LINES, INC.**, Defendant-Appellee.

No. 18616.

United States Court of Appeals, Seventh Circuit.

Sept. 2, 1971.

**610**

Eugene Cotton, Richard F. Watt, Chicago, Ill., for plaintiff-appellant; Cotton, Watt, Jones, King & Bowlus, Chicago, Ill., of counsel.

Stuart Bernstein, Arthur J. Kowitt, Chicago, Ill., for defendant-appellee; Mayer, Brown & Platt, Chicago, Ill., of counsel.

Before SWYGERT, Chief Judge, and PELL and STEVENS, Circuit Judges.

PELL, Circuit Judge.

Although flying the friendly skies of United, pilot Pomrening found them less cordial to his seniority status than he claimed they should be because of his status as an honorably discharged veteran of the United States Navy. Accordingly, he brought an action against United Air Lines, Inc., his employer, under Section 9 of the Military Selective Service Act of 1967, 50 U.S.C. App. § 459.

The district court heard the case on stipulated facts, exhibits, affidavits and depositions without oral testimony. The court dismissed the complaint on the merits finding that Pomrening had been accorded all the benefits and privileges to which he was entitled. From the adverse judgment, Pomrening has brought the present appeal.

Pomrening was first employed by United on October 23, 1961, following a selective pre-hiring screening. He was immediately assigned to United's Flight Officer Training Class No. 54 along with 17 other pilot trainees. He completed only one day of the 17 week training program before being recalled to active duty as a Navy pilot, having been unsuccessful in his attempt to secure a delay in his call to military service.

Pomrening was discharged from active duty on October 5, 1965. Following appropriate request, he was reemployed by United on November 15, 1965, and assigned to Training Class No. 108. He successfully completed the training program on February 11, 1966, and was "assigned to the line" as a qualified Second Officer along with all other members of Class No. 108 who had successfully completed their training.

Pursuant to collective bargaining agreements in effect both at the time Pomrening was first hired and at the time he completed his training, pilot seniority did not begin to accrue until an employee successfully completed the

training program and was given his "first assignment to the airline as a pilot for active duty. * * *" Position on the pilot seniority list determines a flight officer's right to bid for promotion and for work on higher paying equipment as well as for work schedules, choice of vacations and home base.

Pilot seniority is to be distinguished from company seniority which controlled a different set of benefits. Company seniority begins to accrue automatically on the date of the first employment with the company and Pomrening admittedly had company seniority beginning October 23, 1961.

Section 9(c) (2) of the Act, 50 U.S.C. App. § 459(c) (2), provides:

"It is declared to be the sense of the Congress that any person who is restored to a position in accordance with the provisions of paragraph (A) or (B) of subsection (b) [of this section] should be so restored in such manner as to give him such status in his employment as he would have enjoyed if he had continued in such employment continuously from the time of his entering the armed forces until the time of his restoration to such employment."

This provision expressly incorporates into the Act the "escalator principle" first announced in Fishgold v. Sullivan Drydock & Repair Corp., 328 U.S. 275, 66 S.Ct. 1105, 90 L.Ed. 1230 (1946). Montgomery v. Southern Electric Steel Co., 410 F.2d 611, 614 (5th Cir. 1969). The rule, as stated in *Fishgold, supra,* 328 U.S. at 284–285, 66 S.Ct. at 1111, is that:

"[The reemployed veteran] does not step back on the seniority escalator at the point he stepped off. He steps back on at the precise point he would have occupied had he kept his position continuously during [his military service]." *See also* Oakley v. Louisville & Nashville R. Co., 338 U.S. 278, 283–284, 70 S.Ct. 119, 94 L.Ed. 87 (1949), and Trailmobile Co. v. Whirls,

331 U.S. 40, 67 S.Ct. 982, 91 L.Ed. 1328 (1947).

United assigned Pomrening pilot seniority number 4034 based upon his completion of training on February 11, 1966, with Class No. 108. Pomrening, on the other hand, claims he is entitled to a number based on the seniority date of the members of his original Class No. 54 whose training was not interrupted by military service, an advancement of some 1050 places on the seniority list.

Resolution of this dispute requires us to determine whether Pomrening's advancement with United was "dependent on fitness and ability and the exercise of a discriminating managerial choice" within the meaning of McKinney v. Missouri-Kansas-Texas R. Co., 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958), or was "automatic" and "depend[ent] essentially upon continuing employment" within the meaning of Tilton v. Missouri Pac. R. Co., 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964).

In *McKinney,* employees were divided into three groups depending on their function, with seniority defined within each group. When McKinney entered the armed services, he held a group 2 position. When he returned, he was placed in a group 1 job with seniority from the date of his reemployment. The Supreme Court rejected his contention that he was entitled to an earlier seniority date based on the fact that he could have applied for available group 1 positions earlier had he not been in the military. The Court found critical a provision of the collective bargaining agreement which stated that "group two (2) [employees] will be given preference over nonemployes in the assignment to positions in group one (1), *based upon fitness and ability* * * *." (Emphasis added.)

The Court concluded that McKinney could not claim the promotion in reliance upon section 9 of the Act, since under the contract it was dependent "not simply on seniority or some other form of

**612**

automatic progression, but on the exercise of discretion on the part of the employer." *McKinney, supra,* 357 U.S. at 272, 78 S.Ct. at 1227.

On the basis of *McKinney,* United argues that Pomrening is not entitled to any retroactive pilot seniority rights since his advancement through the training program was greatly dependent upon the exercise of management discretion. Both the stipulation at trial and United's brief to this court set out in detail the rigorous program for training pilots. There is little dispute that the program is filled with tests, examinations and evaluations and that if any trainee fails to meet the standards demanded by United, he is dismissed from the program and from United's employ.

However, these standards while naturally calling for greater mental ability and physical agility than would be needed for wheelbarrow trundling, nevertheless are obviously uniformly applied to the members of the training classes. Absolute perfection was not required on the part of a trainee during the course. Numerous written examinations were given with 70 or 80% being a passing grade. A second opportunity to pass was given if a failing grade had been received in the written examination and it was only after a second failure to secure a passing grade that a trainee was ordinarily terminated.

While the writer of this opinion might have a personal preference that any airplane in which he was a passenger have pilots who had never achieved less than 100% on any test, it seems clear that working with the Federal Aviation Agency, the company had devised objective standards to insure well qualified pilots with a course of testing to see that those qualifications were being met.

In any event, it appears from Supreme Court pronouncements following *McKinney* that the type of employer discretion exercised by United is not such as to defeat a veteran's seniority rights.

*McKinney* was found distinguishable by the Court in *Tilton, supra,* 376 U.S.

169, 84 S.Ct. 595, 11 L.Ed.2d 590. At the time Tilton was called to military service, he held "provisional carman status." Under the collective bargaining agreement, he was not entitled to journeyman seniority until he had completed 1,040 days of actual work in the provisional status. After his return from the military, Tilton completed the 1,040 day requirement by working an additional 895 days on the provisional status. He was then given journeyman seniority status, but only from the day he actually completed the provisional period. The Court held that he was entitled to "a seniority date reflecting the delay [in advancement] caused by military service." *Id.* at 181, 84 S.Ct. at 602.

The Court noted that once the employee had successfully completed the work period and made his election, he received the journeyman status and that promotion therefore was automatic. *Id.* at 178, 84 S.Ct. 595.

Having reached that conclusion, the Court found unpersuasive the fact that successful completion of the training period was "subject to certain contingencies or 'variables' * * * [including] continuing satisfactory work by petitioners in the [provisional] position * * *." *Id.* Noting that "in every veteran seniority case the possibility exists * * * that the veteran would not have worked satisfactorily during the period of his absence * * *," the Court held that despite such a contingency, Tilton's case was like those "where advancement depends essentially upon continuing employment. * * *" *Id.* at 179, 84 S.Ct. at 601.

In summarizing its holding, the Court stated:

"* * * we conclude that Congress intended a reemployed veteran, who, upon returning from military service, satisfactorily completes his interrupted training, to enjoy the seniority status which he would have acquired by virtue of continued employment but for his absence in military service. This requirement is met if, as a matter of

foresight, it was reasonably certain that advancement would have occurred, and if, as a matter of hindsight, it did in fact occur." *Id.* at 181, 84 S.Ct. at 602.

In deciding *Tilton,* the Court relied upon its earlier *per curiam* decision of Diehl v. Lehigh Valley Railroad Co., 348 U.S. 960, 75 S.Ct. 521, 99 L.Ed. 749 (1955). The facts in *Diehl* were essentially identical to those in *Tilton.* The circuit court held that Diehl was entitled to carman seniority only from the date on which he actually completed the work period following his return from military service. It reasoned that this treated him as though he were "on furlough" during his military service within the meaning of the Act, 50 U.S.C. App. § 459(c) (1), and did not discriminate against him.

The Supreme Court rejected this theory in a short *per curiam, Id.,* and in *Tilton* reaffirmed this rejection of the idea that "the Act protects only rights which are a mere function of time in grade and does not entitle the veteran to be treated *as if he had been actively employed or trained* during the period of military service." *Tilton, supra,* 376 U.S. at 176, 84 S.Ct. at 600. (Emphasis added.)

On the same day it decided *Tilton,* the Court decided Brooks v. Missouri Pac. R. Co., 376 U.S. 182, 84 S.Ct. 578, 11 L.Ed.2d 599 (1964). There the Court relied upon *Tilton* to grant a veteran retroactive seniority rights upon completion of a training period where *"in practice * * * discretion had no play * * *.* [T]ransition from the rank of apprentice to the rank of mechanic was automatic." *Id.* at 183, 84 S.Ct. at 579. The Court further found that:

"* * * the possibility that the 'balance between supply and demand' would have prevented petitioner's otherwise automatic promotion should not defeat his seniority claim. This possibility, like the possibilities discussed in *Tilton,* always exists * * *. [B]ut for petitioner's military service,

he probably would have achieved, by virtue of continued satisfactory employment, seniority status as a journeyman mechanic in North Little Rock on November 3, 1955. It follows, therefore, that he is entitled to this status under the relevant statutes." *Id.* at 185, 84 S.Ct. at 580. (Emphasis added.)

Given the subsequent decisions of *Diehl, Tilton* and *Brooks,* it would appear that the "employer discretion" found critical in *McKinney* is the employer's discretionary choice to select some employees for advancement, promotion or transfer while passing over others. Where such discretion exists, the returning veteran may not invoke the Act to "overrid[e] an employer's discretionary choice. * * *" *McKinney, supra,* 357 U.S. at 272, 78 S.Ct. 1222, 2 L.Ed.2d 1305.

However, where the discretion is of the type inherent in virtually every training program, the reemployed veteran is, upon qualification, entitled to claim the seniority status which he would have acquired, but for his military service, by the earlier completion of the training program. Such discretion would include, as a minimum, an employer's discretion to determine whether an individual employee is performing sufficiently well to warrant his advancement in the normal course to a position or status awarded to all those who continue their employment and successfully complete a probationary or training period.

Thus, under *Tilton's* test, Pomrening will be entitled to the seniority status he claims if two factors are present. First, it must appear, as a matter of foresight, that pilot trainees who successfully completed United's training course were regularly advanced to flight officer status. Second, it must appear, as a matter of hindsight, that Pomrening would have probably completed his training in the normal course had it not been interrupted by his military service. *See* Brickner v. Johnson Motors, 425 F.2d

75, 77 (7th Cir. 1970). Both factors are clearly present.

While United devotes much time to the discussion of the intricacies of its training program and emphasizes the rigorous standards and tests by which it determines the proficiency of its trainees, it cannot dispute the fact that all trainees who successfully met those standards during the training period were awarded flight officer status. In describing the program as it existed when Pomrening first entered it, and as it apparently still exists, the stipulation of facts states, without qualification, that:

"Following completion of the new-hire program, the successful candidates were assigned to the line as second officers of United's DC–6 aircraft."

In its brief to this court, United again details its program at length, but concludes its description by stating that:

"Only if the student was successful in demonstrating proficiency in all maneuvers covered during [the final step in the flight officer program] was he eligible for FAA qualification. * * * After a brief graduation ceremony, the student received his first line assignment as a second officer."

Thus, it is clear that it could be predicted as a matter of foresight that had Pomrening successfully completed the training period, he would have been awarded the position and seniority status for which he now contends.[1]

United argues at length that it was not predictable that Pomrening would have successfully completed the program. There are two answers to this. First, as we understand Diehl, Tilton and Brooks, this fact is irrelevant. We agree with the Fourth Circuit's conclusion that Tilton means that "if as a matter of course a company assigns se-

niority to an employee who satisfactorily completes his training, a veteran similarly situated * * * is entitled to the seniority he would have attained had his training not been interrupted by military service * * *. [F]or purposes of the Act an employer's discretion is exhausted by selection of an employee for training in those situations where promotion for a successful trainee is automatic." Collins v. Weirton Steel Co., 398 F.2d 305, 309 (4th Cir. 1968).

In Diehl, Tilton and Brooks, the Court was not concerned with the likelihood that the veteran would have completed the training, but only with likelihood that he would have been advanced if he did successfully complete it. See Tilton, supra, 376 U.S. at 178–179 & 180–181, 84 S.Ct. 595, 11 L.Ed.2d 590. See also Montgomery, supra, 410 F.2d at 613–614 & 615; Hatton v. Tabard Press Corp., 406 F.2d 593 (2nd Cir. 1969); Witty v. Louisville & Nashville R. Co., 342 F.2d 614, 616–617 (7th Cir. 1965); and Moe v. Eastern Air Lines, Inc., 246 F.2d 215 (5th Cir. 1957), cert. denied, 357 U.S. 936, 78 S.Ct. 1380, 2 L.Ed.2d 1550 (1958). Cf. Basset v. Texas & Pacific Ry. Co., 258 F.2d 819 (5th Cir. 1958), where not all qualified apprentices were promoted.

However, even were United correct in contending that the test is the reasonable foreseeability of Pomrening successfully completing the training program, it would alter nothing in the instant case. United takes great care in screening applicants to the end that once a person is admitted to the program, his chances for success are extremely high.

Applicants first fill out an application covering "basic qualifications." They are then tested to determine learning ability and temperament. This is followed by two separate pre-hire interviews. Applicants are then tested again by an independent firm to determine

---

1. We note that the foreseeability of automatic promotion of successful provisional employees may be based upon the regularity of the employer's actual practice even where there is no express contractual

right to such promotion. Brooks, supra, 376 U.S. 182, 84 S.Ct. 578, 11 L.Ed.2d 599 and Power v. Northern Illinois Gas Co., 388 F.2d 427 (7th Cir. 1968).

their potential as flight officers. Applicants must then pass a thorough physical examination. Finally, an applicant's file is reviewed by a committee of United's vice presidents and their staffs. The result of this care in selecting trainees was that, *on an overall basis,* 89% of those selected completed the program successfully. In its brief on appeal, United concedes that it attempted "to limit initial entry in the program to those who appeared to have the aptitude and potential for pilot status."

Based on United's own statistics, trainees admitted to the program *with the test scores achieved by Pomrening* had an 86% chance to complete the program successfully. Certainly this indicates that the critical exercise of discretion came in admitting Pomrening to the program and that any discretion which remained thereafter to drop him from the program was insufficient in practice to justify the conclusion that it was not reasonably foreseeable that Pomrening would have successfully completed the program in the normal course had he not been recalled to active duty in the military. To say that a one-in-seven chance of failure would be sufficient to deny the protection of the Act to a reemployed veteran would fly in the face of the mandate of the Supreme Court that the Act "is to be liberally construed for the benefit of those who left private life to serve their country * * *." *Fishgold, supra,* 328 U.S. at 285, 66 S.Ct. at 1111.

Having determined that it was reasonably foreseeable as a matter of foresight not only that Pomrening would have been promoted to flight officer had he completed the training program successfully but also that he probably would have so completed the program, we turn to the second facet of the *Tilton* test— whether Pomrening did in fact upon his return complete the program and obtain pilot seniority status so as to support the hindsight assumption that he would have done so earlier but for the interruption caused by his military service.

The stipulation of facts completely disposes of this issue in Pomrening's favor. It is stipulated that upon his return to United's employ, Pomrening successfully completed the training program and was assigned to the line as a second officer. It is further stipulated that he has since that time passed all required proficiency checks and performed all duties and assignments in a satisfactory manner.

United points to certain relaxations of the training program requirements between the time Pomrening first entered it and the time he ultimately completed it. As a matter of fact, we are not persuaded that these detract from the reliability of the hindsight assumption that Pomrening would have passed the program as it previously existed. As a matter of law, we think the hindsight test of *Tilton* is satisfied when the reemployed veteran fulfills the relaxed requirements for advancement existing upon his reemployment. His rights may not be defeated by the employer's relaxation of requirements over which he has no control.

United also argues that, as a matter of hindsight, it is unlikely that Pomrening would have retained his employment with United had he not been recalled to active duty. Without deciding whether this circumstance is legally significant in light of the assumption of the Act that his employment would have continued, 50 U.S.C. App. § 459(c) (2), we may dispose of the argument on the particular facts of the instant case.

United stresses the fact that during Pomrening's absence in the military, the employment of all members of his training class was terminated when United reduced its staff of flight officers. Only two members of his class were ultimately reemployed by United. However, it is also clear from the stipulation that less than a year after the mass termination all available flight officers, with the exception of one unsatisfactory employee, were offered reinstatement with their original relative seniority

positions.[2] Thus, but for his military service, Pomrening, an admittedly satisfactory employee, would have had the option to accept reinstatement with United with his relative seniority position intact. This is essentially similar to the situation *Tilton* and *Diehl* where seniority in the journeyman status did not begin to run until and unless the employee made an election that it should. The Court found that this contingency did not defeat the veteran's journeyman seniority rights upon reemployment and qualification for the journeyman status. *Tilton, supra,* 376 U.S. at 178–179, 84 S. Ct. 595, 11 L.Ed.2d 590.

Thus we conclude that *Diehl, Tilton* and *Brooks,* rather than *McKinney,* control the instant case and that Pomrening's situation fully meets both the foresight and the hindsight tests formulated in *Tilton.* Accordingly, Pomrening is entitled to the pilot seniority number he would have obtained had he completed United's training program with Training Class No. 54 to which he was originally assigned.[3]

A comment of the district court during the argument of this case before it indicates some apprehension that the conclusion we now reach could have the effect of qualifying Pomrening to pilot equipment for which he does not have the requisite skill and training. Such apprehension is unfounded. All that we award Pomrening is a more advantageous seniority number. It will enable him *to bid* for jobs. It will not entitle him to be awarded any specific position unless and until he fulfills the proficiency requirements which United has established as a prerequisite to holding such position. As *Tilton* held, "A returning veteran cannot claim a promotion that depends solely upon satisfactory completion of a prerequisite period of employment training unless he first works that period. But upon satisfactorily completing that period * * *, he can insist upon a seniority date reflecting the delay caused by military service." *Tilton, supra,* 376 U.S. at 181, 84 S.Ct. at 602.

The claim of Pomrening for loss of compensation poses difficult factual questions in view of the fact that his incorrect seniority number may have deprived him of the opportunity of acquiring higher paying positions which he nevertheless has not held and for which he presumably has not yet demonstrated that he possesses the proficiency requirements. We have insufficient facts before us to attempt to lay down any guide lines. Additional facts will have to be brought out before the district court as a basis for determining the extent, if any, to which Pomrening is entitled to loss of compensation.

The judgment of the district court is reversed and the cause remanded for further proceedings not inconsistent herewith.

Reversed and remanded.

---

**2.** The record indicates that a great many of the pilots had accepted employment with other airlines and that United had an agreement with the other airlines not to attempt to rehire the pilots in question. After getting back as many as it could, they being "one of the highest qualified group of pilots that they [United] had been able to find in a long time," the company in fact did hire additional personnel.

**3.** Because of the extensive Supreme Court action in this area in recent years, we felt it appropriate to review the law in some detail. However, we note that this court has previously decided a case predating *McKinney, Diehl, Tilton* and *Brooks* which presents similar facts and reaches a result similar to that we announce here. See Morris v. Chesapeake & Ohio Ry. Co., 171 F.2d 579 (7th Cir. 1949), cert. denied, 336 U.S. 967, 69 S.Ct. 938, 93 L.Ed. 1118, adopting the opinion of then District Judge, now Chief Judge, Swygert, reported at 75 F.Supp. 429 (N.D.Ind.1947).