Harold Steven CHERNOFF, Plaintiff,

v.

PANDICK PRESS, INC., Defendant.

No. 75 Civ. 846 (WCC).

United States District Court,
S. D. New York.

Sept. 14, 1976.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for plaintiff; Frederick P. Schaffer, Asst. U. S. Atty., New York City, of counsel.

Oscar A. Meyerson, New York City, for defendant.

## OPINION

CONNER, District Judge:

In order to mitigate the hardships visited upon those who are called to serve in the Armed Forces, Congress enacted 38 U.S.C. § 2021 (Section 2021),[1] which, *inter alia,* requires employers to restore returning veterans to positions of seniority, status and pay equivalent to that which they would have enjoyed had their employment not been interrupted. Alleging that defendant Pandick Press, Inc. (Pandick) failed to accord him the veteran's reemployment rights to which he claims entitlement, on February 20, 1975, plaintiff Harold Steven Chernoff (Chernoff) commenced this action pursuant to the provisions of Section 2021 and its jurisdictional counterpart, 38 U.S.C. § 2022.[2] Chernoff seeks a judgment (1) declaring that Pandick violated Section 2021, (2) ordering his reemployment with retroactive adjustment of his seniority date and (3) ordering Pandick to compensate him for any lost wages and benefits. In resisting Chernoff's claims, Pandick relies essentially upon two arguments. First, asserting

1. 38 U.S.C. § 2021 provides, *inter alia:*

   (a) In the case of any person who is inducted into the Armed Forces of the United States under the Military Selective Service Act (or under any prior or subsequent corresponding law) for training and service and who leaves a position (other than a temporary position) in the employ of any employer in order to perform such training and service, and (1) receives a certificate described in section 9(a) of the Military Selective Service Act (relating to the satisfactory completion of military service), and (2) makes application for reemployment within ninety days after such person is relieved from such training and service or from hospitalization continuing after discharge for a period of not more than one year—
   
   \*      \*      \*      \*      \*      \*
   
   (B) if such position was in the employ of a State, or political subdivision thereof, or a private employer, such person shall—
   
   (i) if still qualified to perform the duties of such position, be restored by such employer or his successor in interest to such position or to a position of like seniority, status, and pay \*  \*  \*
   
   (b) \*  \*  \*
   
   (2) It is hereby declared to be the sense of the Congress that any person who is restored to or employed in a position in accordance with the provisions of clause (A) or (B) of subsection (a) of this section should be so restored or reemployed in such manner as to give such person such status in his employment as he would have enjoyed if such person had continued in such employment continuously from the time of such person's entering the Armed Forces until the time of such person's restoration to such employment, or reemployment.
   
   \*      \*      \*      \*      \*      \*

2. 38 U.S.C. § 2022 provides:
   
   If any employer, who is a private employer or a State or political subdivision thereof, fails or refuses to comply with the provisions of section 2021(a), (b)(1), or (b)(3), or section 2024, the district court of the United States for any district in which such private employer maintains a place of business, or in which such State or political subdivision thereof exercises authority or carries out its functions, shall have the power, upon the filing of a motion, petition, or other appropriate pleading by the person entitled to the benefits of such provisions, specifically to require such employer to comply with such provisions and to compensate such person for any loss of wages or benefits suffered by reason of such employer's unlawful action. Any such compensation shall be in addition to and shall not be deemed to diminish any of the benefits provided for in such provisions. The court shall order speedy hearing in any such case and shall advance it on the calendar. Upon application to the United States attorney or comparable official for any district in which such private employer maintains a place of business, or in which such State or political subdivision thereof exercises authority or carries out its functions, by any person claiming to be entitled to the benefits provided for in such provisions, such United States attorney or official, if reasonably satisfied that the person so applying is entitled to such benefits, shall appear and act as attorney for such person in the amicable adjustment of the claim or in the filing of any motion, petition, or other appropriate pleading and the prosecution thereof specifically to require such employer to comply with such provisions. No fees or court costs shall be taxed against any person who may apply for such benefits. In any such action only the employer shall be deemed a necessary party respondent. No State statute of limitations shall apply to any proceedings under this chapter.

that the status to which Chernoff claims entitlement is dependent upon managerial choice, rather than merely upon seniority, Pandick claims that decisions such as *McKinney v. Missouri-Kansas-Texas R. R. Co.,* 317 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958), place this case without the scope of Section 2021. In the alternative, Pandick claims that, despite the provisions of Section 2021, under an applicable collective bargaining agreement it is powerless to grant Chernoff a more favorable seniority date or to adjust his status in any other respect.

Although many of the relevant facts are undisputed, in order to facilitate an understanding of the legal discussion which will follow, a detailed recitation of the facts is appropriate. This opinion incorporates the Court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P.

### I.

Pandick is a large, well-known printing firm located at 345 Hudson Street, New York, New York, within the Southern District of New York (Joint Exhibit [JX] 1, ¶ 1). On September 17, 1966, Chernoff was hired to work as a "floor boy," the most junior position on Pandick's cylinder press crews. In due course, on November 23, 1966, Chernoff became a member of the New York Printing Press Assistants and Offset Workers Union No. 23 (the Union), which at all relevant times was, and still is, the collective bargaining agent for Pandick's employees.

In addition to floor boys, Pandick's cylinder press crews include, in ascending order of experience and responsibility, "fly boys," "tenders," "operators" and "pressmen." Floor boys, fly boys and tenders are collectively referred to as "utility workers." (Tr. 123–25). Operators and pressmen, after completion of their applicable apprenticeships, are titled "journeymen."

There is no formal course of instruction in the operation of a cylinder press. Nor is a specific test administered to determine one's ability to carry out any of the tasks required of a cylinder press crewman. Or-

dinarily, an individual is employed initially, as was Chernoff, in the unskilled position of floor boy and, if capable, will advance to the higher paying, more responsible positions. Chernoff's work was satisfactory and on December 12, 1966 and January 23, 1967 he received promotions, first to fly boy and later to tender.

In mid-February 1968, while a tender, Chernoff was assigned to work as a "temporary operator." A temporary operator performs the duties of an operator when, for some reason, the regular operator is absent, creating a short-term need for a substitute (Tr. 78–79, 38–39). This did not constitute a promotion, but rather, as the name suggests, was merely a temporary, out-of-title assignment which could not be expected to last for more than a few weeks. Although a utility worker temporarily assigned to function as an operator is paid as an operator while filling that position, once the regular returns, the temporary is restored to his original job and pay scale.

Where a permanent vacancy arises, it cannot be filled by a temporary. The employer, in this case Pandick, can either request the Union to furnish a journeyman operator to fill the position or, as was the practice at Pandick, the employer can upgrade a utility worker to apprentice operator.

Pandick urges that it possesses broad discretionary powers in determining which utility worker will be promoted to apprentice operator, but the evidence belies that assertion. Although Pandick could elect to pass over a utility worker whom it considers to be "incompetent," in practice the utility worker with the greatest seniority is routinely offered the promotion first. In fact, the Court has not been apprised of a single instance in which Pandick did not thus follow seniority.

Once the decision is made to upgrade a utility worker, it is the responsibility of the employer, not the employee, to notify the Union of this fact so that the employee can be registered with the Union as an apprentice operator (JX–1, ¶ 20; Tr. 128, 176–77).

The Union then conducts an investigation to determine whether there are any objections (e. g., a fellow employee's claim of discrimination) to the proposed upgrading (Tr. 128). If there are no objections, the employee will be registered as a matter of course (JX–1, ¶ 20).

The apprenticeship lasts for a nominal period of 2½ years (JX–1, ¶ 17(a)), which may be, and often is, shortened by the employer (JX–1, ¶ 17(a), 23; Tr. 129, 168–69). During the first six months of the apprenticeship, the apprentice may be discharged if found to be incapable (JX–1, ¶ 17(b)). However, after that initial period, completion of the apprenticeship and promotion to journeyman operator is assured (JX–1, ¶ 23; Tr. 133).

Apprentice operators working for a particular shop will ordinarily be upgraded to journeymen in the order in which they were registered as apprentices (Tr. 141, 170, 172). However, in the event that an apprentice operator is, for any reason, upgraded to journeyman after an employee whose apprenticeship commenced later than his, for the purpose of seniority the dates of their registration as apprentice operators are determinative. (JX–1, ¶ 24; Tr. 141, 172–73).

Chernoff claims that, after he had worked as a temporary operator for a week or so, Austin Gauthier, Pandick's night shift foreman, offered him a promotion to apprentice operator. Chernoff testified that he accepted the promotion (Tr. 11) and was thereafter paid as an apprentice operator (PX–11, p. 7; Tr. 13). Chernoff, however, concedes that he made no effort to determine whether he was registered with the Union as an apprentice (Tr. 12); he claims that he was not even aware of the registration process (Tr. 12).

On April 5, 1968, Chernoff left Pandick to enter military service (JX–1, ¶ 6), which continued until his honorable discharge on November 7, 1969 (JX–1, ¶ 7). While Chernoff was in service, two of his co-workers, Richard Santapola and Stephen Cottonaro, were promoted to apprentice operator and promptly so registered with the Union (JX–1, ¶ 9). Santapola was registered as an apprentice on July 26, 1968 and as a journeyman on August 8, 1969. Cottonaro was registered as an apprentice on October 30, 1969 and as a journeyman on November 6, 1970.

In early January 1970, after his discharge from the Marine Corps, Chernoff sought reemployment at Pandick. He was rehired and assigned to work as an apprentice operator (JX–1, ¶ 8). He was paid at the scale of an apprentice operator in his third six-month period of such apprenticeship (JX–1, ¶ 8). Pandick's records indicate that Chernoff was assigned to replace an employee by the name of Frank Vistocci, who was permanently leaving Pandick's employ (PX–11, p. 8; JX–1, ¶ 8).

In early March 1970, Pandick's general foreman, Carmine Cuomo (Cuomo), called John Siliato, president of the Union, to obtain information regarding Chernoff, Santopola and Cottonaro for the purpose of determining their relative seniority in the event of a layoff. Siliato referred the matter to the Union's secretary-treasurer, Thomas Donahue (Donahue), who, after checking the Union records, informed Cuomo that Chernoff need not be considered in any computation of relative apprentice operator seniority; Chernoff, it seems, had never been registered with the Union as an apprentice operator and was still being carried on the Union's records as a tender.

According to Donahue, Cuomo reacted to this disclosure with surprise, stating that Chernoff had been working, and was being paid, as an apprentice operator for some time and that he, Cuomo, would forthwith forward a letter to the Union recommending Chernoff's registration (Tr. 144–45, 180).

In a letter dated March 5, 1970, Cuomo officially notified the Union that Chernoff was working as an apprentice cylinder press operator and had been receiving the pay scale for the third six-month period of such apprenticeship (PX–17). On April 27, 1970, Chernoff was registered with the Union as an apprentice operator and was upgraded to journeyman on April 27, 1971 (JX–1, ¶ 12).

Despite his claim that he had been upgraded to apprentice operator in 1968, until his actual registration with the Union on April 27, 1970, Chernoff continued to carry a utility worker's union card and had paid union dues at a rate lower than that required of an apprentice operator. Chernoff seeks to explain this fact by pointing out that regardless of his prior title, *i. e.,* floor boy, fly boy or tender, he had always paid the same union dues. Thus, Chernoff claims, it is not surprising that he was unaware that apprentice operators paid higher dues to the Union than did utility workers. Chernoff also points out, correctly, that none of the union books he had been issued, either before or after his return from the service, clearly designated his job status or the fact that apprentice operators were required to pay a higher rate of union dues than utility workers.

Pandick contests the suggestion that there was any intention to upgrade Chernoff to apprentice operator before March 1970. Pandick claims that, before his departure to the service, Chernoff had merely been "temporarily assigned to work as an apprentice operator." It is Pandick's position that Chernoff retained such status until March 5, 1970 (the date of Cuomo's letter to the Union), when Pandick

> "exercised its *discretionary* right to initiate [Chernoff's] promotion by recommending his registration as an apprentice, and that it was not until he was so registered by the [U]nion that his status became permanent, and his seniority date became fixed and absolute." (emphasis added).

Pandick further argues that "[t]here is nothing in the record" to support Chernoff's claim that he had been promoted from utility worker to apprentice operator before leaving for the service in 1968. In support of its contention, Pandick relies upon the Union's records, which, as indicated above, do not support Chernoff's claim of a pre-service promotion.

Surely, it is undisputed that the various job classifications such as tender, fly boy and operator are titles created by the Union

and an upgrading or promotion does not ordinarily become official until the employee's new status has been duly registered with the Union. It is also conceded that Chernoff was not registered as an apprentice operator until April 27, 1970 in response to Cuomo's letter of March 5, 1970. However, to infer from these facts that there was no intention to upgrade Chernoff to apprentice operator would be a mistake. Lack of union registration, at least in this case, indicates nothing more than a failure on Pandick's part to satisfy its acknowledged responsibility to notify the Union when it upgrades a utility man to apprentice operator. The balance of the credible evidence strongly supports Chernoff's claim that in late February or early March 1968, before he entered the service, Chernoff had been chosen for advancement to apprentice operator.

The evidence discloses that, as of February 19, 1968, Pandick's records list Chernoff as a "temporary operator" (PX–11, p. 6) being paid an operator's wage of $148.09 per week as required by the applicable collective bargaining agreement. However, this figure was subsequently crossed out and replaced with the $116.35 wage paid to apprentice operators. This change is consistent with Chernoff's claim that he worked briefly as a temporary operator before being offered an apprenticeship.

As of April 2, 1968, Pandick's records were changed again to list Chernoff as an "apprentice operator" (PX–11, p. 7). The "Employee Change in Status Notification" form nowhere indicates that this change was anything but permanent. Similarly, apprentice operator status was also noted on the designation sheets prepared upon Chernoff's departure for, and return from, service (PX–11, pp. 5, 8). In addition, there is *no* record dated in March or April 1970 to reflect that Pandick considered Chernoff's actual registration as an apprentice operator to be a change in his status.

While Pandick's records support Chernoff's testimony, they refute Pandick's position. For example, in a document prepared for the Department of Labor by Pandick's

office service manager, Walter Rein, it is stated that Chernoff, after working briefly as a temporary operator, "BECAME APP. OPER. JUST PRIOR TO BEING DRAFT-ED." (PX–12).

At trial, Rein testified that, where a change of classification is "temporary," that fact is reflected on the employment records, as it was when Chernoff was assigned to work as a "temporary operator" (Tr. 80; PX–11, p. 6). Significantly, none of Pandick's records subsequent to February 1968 lists Chernoff as a "temporary" employee (PX–11, pp. 5, 7, 8).

Union official Donahue testified that there is no such job classification as temporary apprentice operator. The collective bargaining agreement, he pointed out, requires that, where there is a temporary need for a fill-in, the fill-in must be paid as a journeyman, not as an apprentice (Tr. 139). Chernoff was always paid as an apprentice operator, not as a temporary operator (JX–1, ¶¶ 4, 5; PX–11, pp. 6–9). Moreover, the Union will permit a utility worker to be assigned to work as a temporary operator only where there is merely a short-term need for an additional operator. If there is a permanent vacancy, other procedures, outlined above, must be resorted to (Tr. 79–80, 138–39). In this case, Chernoff had functioned as an operator, and in no other capacity, for five months prior to his actual registration (Tr. 26–27). There is no evidence, or suggestion, that the vacancy which Chernoff had been assigned to fill was anything but permanent.

It is clear that in March or April 1968, before his departure for the service, Chernoff was upgraded from tender to apprentice operator, but, unfortunately, this fact was not communicated to the Union until two years later. As a direct result of this omission, Chernoff was considered by both Pandick and the Union to possess less seniority than either Santapola or Cottonaro, both of whom were upgraded to, and registered as, apprentice operators while Chernoff was in the Marine Corps.

Due to a lack of incoming work, Chernoff was laid off on December 18, 1970; Santapola and Cottonaro were not. Chernoff immediately complained to the Union but was told that the Union considered the registration date to be critical and accordingly viewed his lay-off as proper. Chernoff was reemployed on March 15, 1971, but suffered additional lay-offs from May 16, 1973 to May 21, 1973, September 7, 1973 to November 15, 1973, December 7, 1973 to December 26, 1973, and from January 8, 1974 until the present (JX–1, ¶ 14).[3] During the same period, Santapola was never laid off and Cottanaro was on lay-off for a total of only five weeks (JX–1, ¶ 15). Thus, if Chernoff had been registered at, or around, the time he was upgraded, he would have enjoyed continuous employment.

## II.

In enacting Section 2021 and its several predecessors, Congress sought

"to provide as nearly as possible that persons called to serve their country in the armed forces should, upon returning to work in civilian life, resume their old employment without any loss because of their service to their country." *Accardi v. Pennsylvania R.R. Co.*, 383 U.S. 225, 228, 86 S.Ct. 768, 771, 15 L.Ed.2d 717 (1966).

Thus, under the provisions of Section 2021, returning veterans are ordinarily entitled to be restored to positions of seniority and status comparable to those which they would have enjoyed but for their tour of duty in the military. See, e. g., *Accardi v. Pennsylvania R.R. Co.*, supra, at 228–29, 86 S.Ct. 768; *Tilton v. Missouri Pacific Railroad Co.*, 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964); *Fishgold v. Sullivan Corp.*, 328 U.S. 275, 284–85, 66 S.Ct. 1105, 1111, 90 L.Ed. 1230 (1946). The Supreme Court enunciated that principle in *Fishgold*, supra, when it observed that the returning veteran

"does not step back on the seniority escalator at the point he stepped off. He

**3.** On October 22, 1974, Chernoff voluntarily withdrew his union membership and is present- ly employed by the Metropolitan Life Insurance Company.

steps back on at the precise point he would have occupied had he kept his position continuously during the war."

However, in *McKinney v. Missouri-Kansas-Texas R.R. Co., supra*, at 271–72, 78 S.Ct. at 1227, the Court cautioned that the reemployment statute cannot be expected to create for the veteran

"a perfect reproduction of the civilian employment that might have been his if he had not been called to the colors. Much there is that might have flowed from experience, effort, or chance to which he cannot lay claim under the statute. [The statute] does not assure him that the past with all its possibilities of betterment will be recalled. Its very important but limited purpose is to assure that those changes and advancements in status that would necessarily have occurred simply by virtue of continued employment will not be denied the veteran because of his absence in the military service. The statute manifests no purpose to give to the veteran a status that he could not have attained as of right, within the system of his employment, even if he had not been inducted into the Armed Forces but continued in his civilian employment.

*Thus, on application for re-employment a veteran is not entitled to demand that he be assigned a position higher than that he formerly held when promotion to such a position depends, not simply on seniority or some other form of automatic progression, but on the exercise of discretion on the part of the employer.*" (emphasis added).

### III.

Combining sweeping claims of managerial discretion with a reading of *McKinney* which would require a claimed promotion to have been an *absolute certainty* before veterans' rights might attach, Pandick invites this Court to reject Chernoff's claims herein. Because Pandick's argument is factually unsupported by the record and legally erroneous under well settled case law, we must decline that invitation.

Any notion that "absolute certainty" of advancement must be proved before a veteran can succeed on a claim under Section 2021 was squarely rejected in *Tilton v. Missouri Pacific Railroad Co., supra*. In that case, the Supreme Court, clarifying its earlier ruling in *McKinney*, recognized that

"[i]t would be virtually impossible for a veteran to show * * * that it was absolutely certain, 'as a matter of foresight' when he entered military service, that all circumstances essential to obtaining an advancement in status would later occur. To exact such certainty as a condition for insuring a veteran's seniority rights would render these statutorily protected rights without real meaning. As Benjamin Franklin observed, 'In this world nothing is certain but death and taxes'." *Id.* 376 U.S. at 180, 84 S.Ct. at 602.

Rather than absolute certainty, Section 2021 requires no more than a showing of "reasonable certainty * * * that [the veteran] would have enjoyed advancement simply by virtue of continuing employment during the time he was in military service." *Id.*

*McKinney*, the *Tilton* opinion explained, merely stands for the proposition that when a promotion is dependent upon management choice, not seniority or some other form of automatic progression, the reasonable certainty of advancement required by the veterans' reemployment statute cannot be proved. Moreover, even where an employer possesses discretion sufficiently broad to defeat a veteran's reemployment rights, the actual exercise of such discretion must also be proved. Thus, in *McKinney*, the applicable collective bargaining agreement explicitly provided that promotion was dependent upon "fitness and ability and the exercise of a discriminating managerial choice." For that reason, the Supreme Court affirmed a dismissal of the complaint. Nevertheless, the Court granted the plaintiff leave to amend the complaint to allege that, despite the specific terms of the collective bargaining agreement, by custom and practice thereunder

the promotion that the plaintiff sought would, in fact, have been automatic had he remained continuously in the defendant's employ. Similarly, in *Power v. Northern Illinois Gas Co.*, 388 F.2d 427 (7th Cir. 1968), the applicable collective bargaining agreement provided that promotion was to be based primarily on ability and that only where there was a substantial equality in ability would seniority be a decisive factor. However, looking beyond the face of the collective bargaining agreement, the court found that in actual practice promotion was based on seniority and ruled in favor of the plaintiff. See also *Puttonen v. Reserve Mining Co.*, 71 CCH Labor Cases ¶ 13,740 (D.Minn.1973); *Whitmore v. Norfolk and Western Railway Co.*, 61 CCH Labor Cases ¶ 10,573 (N.D.Ohio 1969); *Burke v. Boston Edison Co.*, 279 F.Supp. 853 (D.Mass.1968).

■ In this case, the evidence adduced at trial establishes that the custom and routine practice at Pandick was to offer employees promotions from utility worker to apprentice operator on the basis of seniority. Utility workers are given no formal training or tests to determine their respective ability to work as operators and, although Pandick theoretically could decline to upgrade an employee whom it considered to be incompetent, the Court has not been apprised of a single instance in which the most senior utility man was passed over. Apparently, the level of competence required by Pandick as a condition precedent to promotion is sufficiently low that no employee has ever failed to meet it. Under the controlling authorities, the degree of managerial discretion wielded by Pandick is insufficient to defeat Chernoff's claim. See *Hatton v. Tabard Press Corp.*, 406 F.2d 593 (2d Cir. 1969).

Moreover, even assuming, *arguendo*, that Pandick possessed the broad discretion to which it lays claim, that fact would not defeat Chernoff's claims. The *Tilton* decision makes it clear that the presence of broad management discretion can defeat a reemployment case only where the claimed "advancement depends on an employer's discretionary choice *not exercised prior to*

*entry into service.*" (emphasis added). As reviewed in considerable detail above, whatever the degree of discretion vested in Pandick, that discretion was exercised in Chernoff's favor *before* his entry into military service in 1968.

■■ Likewise, the fact that Chernoff's advancement from apprentice to journeyman depended upon satisfactory completion of a probationary period does not serve to defeat Chernoff's claim. In *Tilton*, the Supreme Court specifically recognized that

"[i]n every veteran seniority case the possibility exists that work of the particular type might not have been available; that the veteran would not have worked satisfactorily during the period of his absence; that he might not have elected to accept the higher position; or that sickness might have prevented him from continuing his employment. In light of the purpose and history of this statute, however, we cannot assume that Congress intended possibilities of this sort to defeat the veteran's seniority rights." *Id.* 376 U.S. at 180–81, 84 S.Ct. at 602.

See also *Pomrening v. United Air Lines, Inc.*, 448 F.2d 609, 613 (7th Cir. 1971); *Hatton v. Tabard Press Corp.*, *supra*, at 856–57. This, of course, does not mean that a returning veteran is automatically entitled to a promotion that depends upon completion of a training period. However, if upon his return from military service a reemployed veteran satisfies the applicable requirements for a promotion, he is entitled to a seniority date which would have been his but for his absence in military service

"if, as a matter of foresight, it was reasonably certain that advancement would have occurred, and if, as a matter of hindsight, it did in fact occur." *Tilton v. Missouri Pacific Railroad Co.*, *supra*, 376 U.S. at 181, 84 S.Ct. at 602.

Since there has never been any question as to Chernoff's competence, it can be deemed reasonably certain, "as a matter of foresight," that Chernoff would have been registered as an apprentice operator before either Santapola or Cottonaro if he had not been absent in military service. Moreover,

"as a matter of hindsight," it is a conceded fact that Chernoff satisfactorily completed his apprenticeship after his return from the service. (JX–1, ¶ 12).

█ Therefore, in the absence of a legally sufficient reason to decline to do so, Pandick was obliged to adjust Chernoff's seniority date to reflect his time spent in the Marine Corps. Pandick claims that, since Chernoff was not actually registered as an apprentice operator until April 27, 1970, and since under normal practice seniority is fixed as of that date, Pandick was not obliged, indeed was not permitted under a collective bargaining agreement with the Union, to grant Chernoff an earlier seniority date. This argument carries little weight; it ignores an unbroken line of cases which have ruled that

> "no practice of employers or agreements between employers and unions can cut down the service adjustment benefits which Congress has secured the veteran under the Act." *Fishgold v. Sullivan Corp., supra,* 328 U.S. at 285, 66 S.Ct. at 1111.

See also *Accardi v. Pennsylvania R.R. Co., supra,* 383 U.S. at 229, 86 S.Ct. 768; *Palmarozzo v. Coca-Cola Bottling Company of New York, Inc.,* 490 F.2d 586, 592 (2d Cir. 1973), *cert. denied,* 417 U.S. 955, 94 S.Ct. 3083, 41 L.Ed.2d 673 (1974).

Thus, Chernoff's reemployment rights do not depend upon what his seniority is under the applicable collective bargaining agreement, but rather, on what it would have been but for his military service. The evidence in this case clearly demonstrates that, but for his tour of duty in the Armed Forces, Chernoff would have enjoyed a position of seniority greater than either Santapola or Cottonaro.

### IV.

In consideration of the facts and authorities reviewed above, it is the conclusion of this Court that, by failing to adjust Chernoff's seniority date to reflect time spent in the Marine Corps, Pandick violated Chernoff's reemployment rights under Section 2021. Pandick is ordered, forthwith, to adjust Chernoff's seniority date accordingly. In addition, Chernoff is entitled to be compensated for any loss of wages and benefits suffered by reason of Pandick's failure to accord him the reemployment rights to which he was entitled.

If the parties are unable to agree upon either the appropriate seniority adjustment or the compensatory damages due Chernoff, they are directed to contact the Court within thirty (30) days from the date of this opinion and the Court will schedule a mutually convenient date for a hearing on those issues. If agreement can be reached, a judgment order should be submitted.