Dennis H. FINK, Plaintiff,

v.

CITY OF NEW YORK, and New York City Fire Department, Defendants.

No. CIV. A. 97–CV–6314 (DGT).

United States District Court,
E.D. New York.

March 1, 2001.

Margaret H. Mayo, Gaffin & Mayo, P.C., New York City, for Plaintiff.

William S.J. Fraenkel, Corporation Counsel of the City of New York, for Defendants.

### MEMORANDUM AND ORDER

TRAGER, District Judge:

Plaintiff Dennis H. Fink, a retired fire marshal with the New York City Fire Department sued the City and the Fire Department under the Uniformed Services Employment and Reemployment Rights Act of 1994 ("USERRA"), 38 U.S.C. § 4301, et seq., and the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, claiming discrimination and retaliation on the basis of his military service and his perceived disability, a hearing loss. A trial was held, and Fink prevailed on all his claims. Defendants now move for judgment as a matter of law overturning the jury's verdict, or, in the alternative, for a new trial, noting numerous dispositive issues on which, they claim, no reasonable jury could have found for Fink.

### Background

At a six-day trial held from July 10–14 and on July 17, 2000, Dennis H. Fink alleged that the defendants violated USERRA by intentionally discriminating against him because of his military service insofar as they failed to offer him a make-up promotional exam immediately upon his return from military service in 1994 or to provide him with appropriate study materials in 1997, when he was given a make-up promotional exam. Fink further alleged that the defendants retaliated against him by altering the terms and conditions of his employment after his return from military duty. In addition, Fink claimed that the defendants violated the ADA, intentionally discriminating against him because they viewed him as hearing-impaired by forcing him to submit to a medical examination

and by changing the terms and conditions of his employment, placing him on light duty and forcing him to work a five-day schedule. Fink also contended that the defendants retaliated against him when he attempted to protect his rights.

At trial, a total of twelve witnesses were called, ten by Fink and two by the defendants. The jury found in Fink's favor on all his claims and awarded him damages as follows: (1) under USERRA, $42,000.00 in compensatory damages for back pay and other lost benefits and $42,000.00 in liquidated damages; and (2) under the ADA, $7,800.00 in compensatory damages and $800,000.00 in emotional distress damages. The court reserved for itself the decision as to the amount of the damages necessary to compensate plaintiff for any lost pension benefits.

On November 16, 2000, judgment in the action was entered awarding Fink the above-mentioned damages, except that in accordance with 42 U.S.C. § 1981a, the statutory damages cap, the court reduced the jury's award for emotional distress damages from $800,000.00 to $300,000.00. In addition, the court awarded, under US-ERRA, prejudgment interest on the back pay award in the amount of $8,282.86 per year in pension, retroactive to June 1, 1999, and $91,000 for liquidated damages, plus attorneys' fees and costs. The court also directed defendants to promote plaintiff to the rank of Supervising Fire Marshal.

Defendants now move for a judgment as a matter of law or, in the alternative, a new trial on six grounds: (1) the defendants are not liable under USERRA because Fink failed to present enough evidence for a reasonable jury to have concluded that there was a reasonable certainty of his promotion in the absence of defendants' discriminatory conduct; (2) Fink is not entitled to liquidated damages because he has not come forth with evidence from which a reasonable jury could have concluded that the defendants' violations of USERRA were willful; (3)

Fink is not entitled to prejudgment interest because there is no clear evidence here that the defendants were intent upon flouting USERRA; (4) the defendants are not liable for retaliating against Fink because he has adduced no evidence from which a reasonable jury could have concluded that retaliatory acts were done by actors with knowledge of Fink's protected activities, viz. filing of discrimination complaints; (5) the defendants are not liable under the ADA because Fink has not shown that his hearing limitation precluded him from holding a broad class of jobs; and (6) the award of $300,000 for emotional distress damages should be reduced because the current award shocks the judicial conscience.

Other pertinent facts will be set forth as they become relevant.

## Discussion

In order to grant a judgment as a matter of law and overturn a jury's verdict, a court must conclude that, "drawing all reasonable inferences in favor of the nonmoving party and making all credibility assessments in his favor, there is [in]sufficient evidence to permit a rational juror to find in his favor." *Sir Speedy v. L & P Graphics,* 957 F.2d 1033, 1039 (2d Cir.1992); *see also* Fed.R.Civ.P. 50. Judgment as a matter of law should not be granted unless there is either "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture" or unless "there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against it." *Galdieri–Ambrosini v. Nat'l Realty and Dev. Corp.,* 136 F.3d 276, 289 (2d Cir.1998).

### (1)

Defendants' first claim is that the evidence at trial was insufficient to find liability under USERRA because there was no reasonable certainty that Fink would have been promoted absent the discriminatory conduct at issue. Defendants argue that

there is no guarantee that he would have passed the promotional exam, had it been administered to him and no guarantee that he would have been promoted even if he had scored highly. But this line of argument is premised on the assumption that the "reasonable certainty" standard is the appropriate one in this case, a proposition for which defendants cite three cases, two from the U.S. Supreme Court and one from the Southern District of New York. Careful examination of these cases, however, reveals that the standard they employ is inappropriate for the case at bar.

In *Chernoff v. Pandick Press, Inc.*, 419 F.Supp. 1192 (S.D.N.Y.1976), Judge Conner had occasion to consider the claim under 38 U.S.C. § 2021, the predecessor of the USERRA sections at issue here, of a veteran who had worked as a utility worker, gone on military leave and returned to find that he had not been accorded the degree of seniority that was due him, which, he contended, would have resulted in his promotion to the rank of apprentice printing press operator. The defendant, his employer, maintained that there was no absolute certainty of promotion since promotion was not an automatic result of seniority, but rather, subject to the employer's discretion.

The district court, however, found that "*absolute* certainty" was an incorrect standard. Examining the Supreme Court's decisions in *McKinney v. Missouri–Kansas–Texas R.R. Co.*, 357 U.S. 265, 78 S.Ct. 1222, 2 L.Ed.2d 1305 (1958) and *Tilton v. Missouri Pacific R.R. Co.*, 376 U.S. 169, 84 S.Ct. 595, 11 L.Ed.2d 590 (1964), the court wrote that "[r]ather than absolute certainty, Section 2021 requires no more than a showing of 'reasonable certainty that the veteran would have enjoyed advancement simply by virtue of continuing employment during the time he was in military service.'" *Chernoff*, 419 F.Supp. at 1198 (citation omitted). Under this standard, the court upheld the plaintiff's claim.

Both *McKinney* and *Tilton* present similar fact patterns. An employee goes on military leave and demands a retroactive promotion upon his return. The Supreme Court then has to decide whether there is a reasonable certainty that he would have been promoted absent his departure. The provision at issue in these cases is either 38 U.S.C. § 2021(b)(2), entitling an employee to be restored or reemployed "in such manner as to give such person such status in his employment as he would have enjoyed if such person had continued in such employment continuously," or a provision much like 38 U.S.C. § 2021(b)(2).

But, the case at bar does not present this same scenario. Here, an employee studies for a test that is a prerequisite for promotion, goes on military leave, which prevents him from taking that test at the scheduled time, returns from military leave a few months later, asks to take the test and is denied the opportunity to do so. Thus, we are not trying to determine what would have happened while he was away on leave, i.e. whether he would have taken the test, passed it and been promoted. Rather, we are assessing the legality of defendants' actual conduct when Fink, returning from military service, requested to take his promotional exam and was refused. Under this fact pattern, a "reasonable certainty" inquiry would make a mockery of the statutory protection. Any returning veteran who is denied a right to take a difficult promotional make-up exam with a low pass rate will never satisfy a "reasonable certainty" standard, and an employer will necessarily avoid any adverse consequences for his violation of the relevant provisions of USERRA. Surely, this is not the outcome Congress intended in enacting the statute.

■ Although, as will be discussed shortly, the "reasonable certainty" standard is inappropriate in the present case, Fink's claim survives even if "reasonable certainty" were the appropriate test, since there was enough evidence for a reasonable jury to find that there is a reasonable certainty that he would have been promoted had not the defendants discriminated

against him. Looking again at the facts of the three "reasonable certainty" cases discussed above, it quickly becomes apparent that some measure of discretion retained by the employer in deciding whether or not to promote the employee does not vanquish the employee's claim. *See Chernoff,* 419 F.Supp. at 1194 ("Although Pandick could elect to pass over a utility worker whom it considers to be 'incompetent,' in practice the utility worker with the greatest seniority is routinely offered the promotion first"); *Tilton,* 376 U.S. at 180, 84 S.Ct. at 602 ("In every veteran seniority case the possibility exists that work of the particular type might not have been available; that the veteran would not have worked satisfactorily during the period of his absence; that he might not have elected to accept the higher position; or that sickness might have prevented him from continuing his employment. In light of the purposes and history of this statute, however, we cannot assume that Congress intended possibilities of this sort to defeat the veteran's seniority rights.") In *McKinney,* where the Supreme Court rejected the employee's claim, the situation was such that "[p]romotion to a group 1 position from group 2, in which petitioner had formerly been employed, is not dependent simply on seniority." *Id.* at 272, 78 S.Ct. at 1227. Rather, "it is dependent on fitness and ability and the exercise of a discriminating managerial choice." *Id.* The Supreme Court concluded: "Petitioner was not entitled to a group 1 position simply because in his absence it had been bulletined, and if he had then been employed he might have applied for it, and respondent might have found that he possessed the requisite fitness and ability." *Id.* The Supreme Court, in its own words, was concerned about "overriding an employer's discretionary choice by any such mandatory promotion." *Id.*

But the facts of Fink's case do not present nearly as much uncertainty as the facts of *McKinney.* There is no question that Fink would have taken the promotional exam. The only open questions are (1) whether it is reasonably certain Fink would have passed the exam; and (2) whether it is reasonably certain that he would have been promoted after having passed the exam. There is enough evidence for a reasonable jury to answer each of these questions affirmatively.

Fink's biography reveals a history of distinction. While serving in the military, Fink received four Meritorious Service Medals, two Army Commendation Medals, two National Defense Service Medals, an Armed Forces Expeditionary Medal, the Armed Forces Service Medal, two Humanitarian Service Medals, the NATO Medal, the United States Marine Corps Combat Action Ribbon, the Republic of Vietnam Campaign Medal, the Republic of Vietnam Service Medal with Two Bronze Stars, the Republic of Vietnam Service of Gallantry, the Republic of Vietnam Action Service Medal, the Armed Forces Reserve Medal, twenty Device Five Army Reserve Component Achievement Medals, the NCO Professional Development Ribbon in the Presidential Unit Citation, the Joint Meritorious Unit Award, the Navy Unit Commendation, the United States Marine Corps Meritorious Unit Commendation, the Army Superior Unit Award Overseas Ribbon, the Army Service Ribbon, Seven Reserve Component Overseas Training Ribbons, the Parachutist Badge, the Special Forces Tab, the Green Beret and the New York State Conspicuous Service Cross. *See* Tr. at 85–86 (all names of awards are derived from the Court Transcript of Fink's testimony, and any mistakes found here appear in the original).

In addition, an evaluation of Fink completed while he was in Bosnia noted the following:

Requires and experiences highest standards for unit personnel. Performed duties admirably under high intensity leadership and extremely challenging work conditions and operational difficulties in an active theatre operation. Most vocal advocator [sic] for unit per-

sonnel. Neither sought nor accepted respite for himself. Always seeks and accepts responsibility as commander of unit. Consistently demonstrated high sense of duty. Outstanding performance throughout the rated period.

*Id.* at 84.

On the exam Fink took for admission to the fire department in 1979, he studied hard and came out in the top three percent (877th out of 35,000 people who took the exam). *See id.* at 66. He testified that he also studied very hard for the 1994 promotional exam and was ready for it. *See id.* at 65–66. On the other hand, the exams that Fink did not pass were one exam that he did not study for because of the common practice in the fire department of taking the multiple choice promotional exam "cold," and losing little more than a $15 fee in the process, Tr. at 66, and one exam, the make-up that he was given three years late for the promotional exam here in question, which tested him on outdated material without his having the benefit of study guides and on which he, nevertheless, received a 64.9, just short of the passing mark, which was set at 70. *See id.* at 108–12.

Given what the jury heard of Fink's outstanding record of achievement in the military and his unquestionable distinction on the examination which he studied for, it could easily have concluded that there is a reasonable certainty Fink would have passed his promotional examination, had he been permitted to take it.

It remains to be determined whether a jury could have found that Fink would have been promoted after having passed his examination. The names of those who pass the promotional exam are placed on a list. *Id.* at 355. The list is arranged in rank order based on test score, plus veterans' preference, plus seniority, plus departmental awards. *Id.* at 356. From that point on, promotion is relatively automatic. The fire department uses a "one in three" rule, which requires the department to hire one out of every three sequentially ranked eligible candidates for promotion. *Id.* at 359. However, the two unpromoted candidates must be considered for the next available promotion along with the next individual from the list. *See id.* at 359.

In other words, if there is a list composed of twenty names, the fire department must promote at least one individual from among the first three on the list. Hypothetically, it chooses the second name on the list. It must then consider, for the next available position, the first, third and fourth candidates on the list. In order not to promote the first candidate on the list, therefore, the fire department would have to pass over him repeatedly as each position is filled. Of the over one hundred people who took the 1994 promotional examination, seventy-four passed. *See id.* at 356–57. Of those seventy-four, eighteen were promoted. *See id.* at 357. The record does not elucidate where on the list the eighteen were ranked.

In his position as fire fighter, Fink received a "service rating A and a class three which is higher award and ... the police honor legion medal for valor." *Id.* at 63. In 1991, a letter was sent from the FBI to a Chief Fire Marshal John Stickevers noting the "outstanding assistance of Fire Marshall Fink to the FBI during the conduct of a defensive Tactics Instructor's Course." *Id.* at 64. "Throughout the course," the letter continued, "Fire Marshal Fink demonstrated his vast knowledge of defensive tactics, techniques as well as his exceptional instructional ability. Fire Marshall Fink greatly enhanced all aspects of the course and attributed [sic] to its tremendous success." *Id.* As far as Fink's performance evaluations, defense counsel represented to the court that "[n]o one is maintaining there was ever a problem with Mr. Fink's performance evaluations" and that "[t]here was never any indication that his work was not satisfactory." *Id.* at 106. Fink also testified that he was submitted by his supervisor for an "exemplary service rating," having "not gone on sick leave for three years and

having never been disciplined in his twenty years on the fire department." *Id.* at 113. All of these factors militate strongly in favor of promotion.

Taking all these facts together, the jury properly concluded there is a reasonable certainty that Fink would have ranked very high on the fire department's eligibility list. The jury could have concluded, given his performance on the prior examination that he took, that Fink would have received a very high score, that, further, his veteran status and his numerous distinctions would have elevated him even higher on the list and that, given his generally outstanding record with the department, that the one-in-three rule would not be used to overlook him repeatedly. None of this is absolutely certain, of course; but absolute certainty is not required. In sum, even assuming that reasonable certainty is the proper standard, some measure of contingency and departmental discretion does not automatically vitiate the employee's claim, and the jury here rightly found that a reasonable certainty of promotion existed in Fink's case.

But, as has been noted at the outset of this discussion, many plaintiffs with cases even slightly weaker than Fink's would not be able to survive a reasonable certainty inquiry of this sort despite being deprived of the opportunity to show their qualifications for a given position by virtue of the defendants' own discriminatory refusal to administer a relevant promotional exam, and as has also been noted, this is surely not the outcome Congress envisioned in enacting USERRA.

The escape from this conundrum lies in the fact that the defendants have indicated the wrong test from the wrong cases decided under the wrong part of USERRA. A similar issue surfaced in a relatively recent case from the Western District of New York brought under the Veterans' Reemployment Rights Act ("VRRA"), the immediate predecessor to USERRA, where a police sergeant, a veteran, was passed over for promotion by the town

where he worked and alleged that his veteran status factored into the employer's decision to refuse him a promotion. *See Hansen v. Town of Irondequoit,* 896 F.Supp. 110 (W.D.N.Y.1995). The District Court there wrote, in relevant part:

> The defendant contends that the VRRA does not apply in cases where the promotion at issue is based on discretionary considerations, rather than on seniority or some other form of automatic progression. [citing *McKinney* ]. *McKinney,* however, along with the other cases cited by defendant in support of this point, can be distinguished by the fact that those cases involved issues of seniority and promotion for veterans who had served on active duty away from their jobs. Upon return, these veterans had claimed a "right" to receive promotions that had been made while they were away. In the instant case, Hansen is claiming that he was discriminated against solely on the basis of his status as a reservist, not because·he spent time on active duty away from his job.

*Id.* at 114. The court proceeded to deny the defendant's motion for summary judgment, allowing the plaintiff's case to go forward after finding that the reasonable certainty standard was inapplicable to the facts. Fink's is an analytically similar case.

■ In addition to requiring a restoration of employment and seniority for an employee on leave, USERRA also prohibits an employer from denying employment benefits to a member of the armed services because of his military obligation. 38 U.S.C. § 4311(a). Specifically, 38 U.S.C. § 4311(a) provides that:

> [A] person who is a member of, applies to be a member of, performs, has performed, applies to perform, or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for

membership, performance of service, application for service, or obligation. *Id.* Under this portion of the statute, an employer may not discriminate against an employee on the basis of the latter's military service, which means, unlike in the usual Title VII context, that the employer must sometimes treat veterans differently from other employees in order to assure that they receive the same benefits as their co-workers.[1] Thus, as in this case, where a neutral employment policy provides that a promotional exam shall only be administered on a particular date to all employees, it may constitute discrimination to refuse to allow veterans away on leave on the date in question to take a make-up exam upon their return from service.

The appropriate test used to determine whether or not discrimination in violation of USERRA (or VRRA, its predecessor) is indeed present in this case is not altogether clear. Some courts have applied the standard Title VII *McDonnell Douglas* burden-shifting framework to the USERRA context. *See, e.g., Hansen,* 896 F.Supp. at 113; *Key v. Hearst Corp.,* 963 F.Supp. 283, 288 (S.D.N.Y.1997); *Sawyer v. Swift & Co.,* 836 F.2d 1257, 1262 (10th Cir.1988); *Novak v. Mackintosh,* 919 F.Supp. 870, 878 (D.S.D.1996); *Tukesbrey v. Midwest Transit, Inc.,* 822 F.Supp. 1192, 1195 (W.D.Pa.1993) ("[I]t is appropriate to apply the burden-shifting mechanism developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny for Title VII cases to VRRA cases."). Other courts, a majority, have applied the burden-shifting framework imported from the Supreme Court's opinion in *NLRB v. Transp. Management Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983). *See, e.g., Kelley v. Maine Eye Care Assocs., P.A.,* 37 F.Supp.2d 47, 54, n. 8 (D.Me.1999) (noting that a majority of courts follows the *NLRB* burdenshifting formulation for USERRA cases); *Sanguinetti v. United Parcel Serv., Inc.,* 114 F.Supp.2d 1313, 1318 (S.D.Fla.2000); *Satterfield v. Borough of Schuylkill Haven,* 12 F.Supp.2d 423, 439 (E.D.Pa.1998). And, there are those courts that do not seem to recognize the difference between the two frameworks. *See Forks v. SPM, Inc.,* 187 F.3d 647, 1999 WL 439441, *1 (9th Cir. 1999) (stating that the burden-shifting framework used for USERRA cases is the same as that used for Title VII cases, then proceeding to quote the *NLRB* framework, and then proceeding to apply the Title VII framework to the facts of the case, without recognizing any of the back-and-forth slippage that has occurred in the analysis).

Ultimately, those courts that blur the distinction between the two frameworks cannot be justly accused of committing a vulgar analytical error, since the two frameworks are not particularly divergent. Both frameworks operate by allowing the employee to establish a prima facie case of discrimination and by then allowing the employer to present evidence of a non-discriminatory motive. The difference is solely that the *McDonnell Douglas* framework has three steps—requiring the employee to make out a prima facie case of discrimination by showing that a member of a protected class was treated differently than a similarly situated person of another class, then, if the plaintiff should carry his burden, shifting the burden to the defendant employer to articulate a legitimate, nondiscriminatory reason for the treatment and if the employer should succeed in so doing, shifting the burden back to the plaintiff to show that the defendant's alleged non-discriminatory reason is a pretext for discrimination, *see McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. at 1824—while the NLRB framework has two steps—requiring the plaintiff to make out his prima facie case by showing that he was a member of a protected class whose protected status was a motivating factor in an adverse employment decision and allowing the employer to then avoid liability by showing that it would have made the same

---

1. The statute is conceptually similar to the ADA in this respect.

employment decision regardless of plaintiff's protected status. *See NLRB*, 462 U.S. at 401, 103 S.Ct. at 2474. In effect, both frameworks require some showing that an adverse employment decision took place under circumstances giving rise to an inference of discrimination, but the burden of proof cast upon the employer to explain the discrimination is procedurally greater under the NLRB test.

█ Despite these similarities, in the wake of the Second Circuit's opinion in *Gummo v. Village of Depew*, 75 F.3d 98 (2d Cir.1996), it appears that the *NLRB* framework is the preferable approach for USERRA cases. In a case where a police officer brought a claim against the village, alleging that he had been terminated in violation of the VRRA, the court wrote that both Senate and House reports counseled courts applying the relevant provisions to use the burden-shifting framework from *NLRB:*

> Under that scheme, a claimant carried his burden of proving a prima facie case of discrimination by showing, by a preponderance of the evidence, that his protected status was 'a substantial or motivating factor in the adverse [employment] action'; but the employer may nonetheless escape liability by showing, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status.

*Gummo*, 75 F.3d at 106 (citation omitted). In addition, unbeknownst to many courts, the actual text of USERRA has been amended to track the language of the *NRLB* framework, specifically mentioning the "motivating factor" standard:

> (c) An employer shall be considered to have engaged in actions prohibited—
>
> > (1) under subsection (a), if the person's membership, application for membership, service, application for service, or obligation for service in the uniformed services is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership, application for membership, service, application for service, or obligation for service.

38 USCA § 4311(c)(1) (1996).

A *motivating factor under the NLRB* test "is not necessarily the sole cause of the action, but rather it is one of the factors that 'a truthful employer would list if asked for the reasons for its decision' " *Sanguinetti, 114 F.Supp.2d* at 1318; *see also Brandsasse v. City of Suffolk*, 72 F.Supp.2d 608, 617 (E.D.Va.1999); *Kelley*, 37 F.Supp.2d at 54; *Robinson v. Morris Moore Chevrolet–Buick, Inc.*, 974 F.Supp. 571, 576 (E.D.Tx.1997). "Military status is a motivating factor if the defendant relied on, took into account, considered, or conditioned its decision on that consideration." *Robinson*, 974 F.Supp. at 576.

█ In the present case, there is more than enough evidence for a reasonable jury to have found that Fink's military status was a motivating factor in the decision to deny Fink his request for a promptly-administered promotional exam. Fink's union representative, John Knox, testified that when he went to speak to Sherry Kevalier, the director of personnel at the fire department, about Fink, her response indicated quite a bit of animosity:

> I went to speak to her about Dennis, and she said I don't want to hear about any more veteran's bullshit. She wouldn't even let me in her office. She became very belligerent. You know, she said he is treated just like anybody else. He's gone off duty. We are going to treat him like he was on a leave of absence....

Tr. at 386. But, of course, he was not on an ordinary leave of absence. In addition, Fink himself testified that when he spoke to Samford Smolowitz at the Fire Department's pension bureau and tried to convince him that federal law required Fink to get credit for his pension while he was away in Bosnia, Smolowitz responded by

saying, "[I] don't know nothing about the law. This is the way the fire department does it." *Id.* at 103. When Fink pressed the issue, Smolowitz told him, according to Fink, that he "didn't want to hear it. He said this is the fire department. This is the way we do it. Period. That's it. You're not getting it." *Id.* at 104. Although Smolowitz himself did not recall whether or not he had had a conversation with Fink, *see id.* at 294, he did not deny it, and a jury could have certainly credited Fink's testimony.

Based on both of these more or less open expressions of hostility toward Fink and his requests, specific hostility toward veterans on the part of the fire department's personnel director, and based on the fire department's actions in denying Fink his request for a make-up promotional exam, administering a make-up exam a few years later on outdated material without the benefit of study guides for that old material, denying him pension benefits due him, placing him on light duty and creating administrative difficulties in returning him to his former position upon his return from Bosnia a reasonable juror could certainly conclude that Fink's veteran status motivated or contributed to the decision not to allow him to take a make-up exam.

The burden then falls on the defendant to show that it would have made the same decision in Fink's case even absent his veteran status. Defendants do not try to articulate any such argument, since neither they in their moving papers nor Fink in his response recognized that the *NLRB* test is more appropriate for this case than the "reasonable certainty" standard.

But it is difficult to see what the defendants could have said even had they recognized the applicable burden-shifting framework. Perhaps, their argument would be that their decision to refuse Fink a make-up exam had nothing to do with Fink's veteran status, but rather, was based simply on the fact that the date for the exam had come and gone. To make the argument is to immediately see its circularity: Fink missed the original date of the examination precisely because he was a veteran, and the entire point of USERRA is to prevent veterans from falling behind their co-workers or suffering adverse employment actions while they are away serving their country. Therefore, the defendants were under an obligation to give Fink his promotional exam immediately upon his return from duty. They cannot now argue that his veteran status had nothing to do with their reasons for refusing to give him that exam, and a reasonable juror could conclude, in light of the evidence of hostility toward veterans in the record, that Fink was indeed denied a benefit of his job as a result of his veteran status. Beyond this point, there is no need to go, and Fink is certainly under no duty to show that he would have been promoted had he taken the test which his own employer denied him the opportunity to take.[2]

---

2. The jury was charged in accordance with the correct legal standard:

> In order to establish an unlawful employment practice, the plaintiff must demonstrate by a preponderance of the evidence that his military service was a motivating factor for the employment action taken against him. A motivating factor is a factor that played a part in the defendants' employment decisions and make a difference in the outcome. There can be more than one motivating factor of any action. The law does not require the plaintiff to show that his military service was the sole reason for the defendants' employment decision, but he must show that military service was a motivating factor.

> Let me caution you, however, that it is not sufficient to find that an employment decision was simply wrong or that it was motivated by unwise departmental policies and procedures. You may not second guess business decisions, even if you disagree with them. Rather, you must find that the employment decisions were motivated, at least in part, by discrimination on the basis of plaintiff's military status.

Tr. at 578–79. In addition, the verdict sheet asked the jury to answer the following question:

> Has the plaintiff established by a preponderance of the evidence that he would have been promoted to the position of Supervising Fire Marshal had he been given a make-

However, there is a slight analytical tension in this entire line of argument. While this record contains evidence of animosity toward veterans, one can easily imagine a case where no such overt hostility is apparent. In most other respects, the facts might be the same. A veteran returns from duty and is denied the opportunity to take a promotional examination that was administered in his absence. How is a claimant in this position supposed to prove that anyone is discriminating against him? Discrimination, after all, requires motivation under the *NLRB* test. It requires discriminatory intent. But the record might show that not a single person at the veteran's workplace is even aware of US-ERRA or its requirements. The veteran misses the exam. He returns and demands to take it. A well-meaning bureaucrat patiently explains that he has missed the date and must now wait until the next time the exam is administered. The veteran, unaware of the law, does not put up a fight, and the matter ends there. There seems to be no discriminatory intent on this fact pattern, and yet, it simply cannot be the case that the injury suffered is not redressable under USERRA.

The source of the dilemma is really a failure to recognize the difference between what under Title VII would be a disparate treatment claim versus a disparate impact claim. The *NLRB* test, like the *McDonnell Douglas* test, is a disparate treatment test, demanding direct or circumstantial evidence of discriminatory intent. But a facially neutral policy that just happens to systematically discriminate against a particular group can be discriminatory without being intentionally discriminatory. A policy that requires all persons, regardless of veteran status, to take their promotional exam on a given date and gives no opportunity for a make-up examination systematically discriminates against veterans. It has a disparate impact, not unlike the kind of disparate impact that a facially neutral law could have upon a religious group entitled, under the Constitution, to the free exercise of its faith. *See, e.g., Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (finding that the state must modify its unemployment compensation requirement of willingness to work on Mondays through Saturdays in order to accommodate the needs of those religiously opposed to working on Saturdays but willing to work on Sundays); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) (finding that the Amish should be exempted from compulsory education after eighth grade).

There is, unfortunately, no caselaw that engages in a disparate impact analysis under USERRA or VRRA. One possibility would track the language of Title VII, which would force the plaintiff to demonstrate a disparate impact on the basis of veteran status, *cf.* 42 U.S.C.e–2(k)(1)(A)(i), at which point a defendant would be able to come forward with evidence that "the challenged practice is job related for the position in question and consistent with business necessity," *id.* The burden would then again fall on the plaintiff to establish pretext, namely that the employer refuses to adopt an available alternative employment practice with less disparate impact that can meet the em-

up promotional exam when it was first requested in 1994 and/or if he had been provided with the proper study materials in 1997?

It is not clear that the jury was legally required to answer this question affirmatively in order to hold the defendants liable under US-ERRA, and, as discussed below, it is arguable that the burden should have been on the defendant to prove that the plaintiff would not have been promoted even had he been given the make-up promotional exam when he first requested it. However, the jury did answer the question in the affirmative, and this was, consequently, harmless error.

The defendants, it should be noted, did not object to this jury charge or to the verdict sheet and may have waived their right now to claim that the court should have required the jury to find a reasonable certainty of promotion. In any case, as has been discussed at length, the reasonable certainty standard is inappropriate in this case.

ployer's business needs equally well. *See* 42 U.S.C. § 2000e–2(k)(1)(A)(ii) & (C). If this were the applicable test, the employee in our hypothetical fact pattern would easily be able to establish that not giving make-up promotional examinations to veterans has a disparate and adverse impact on veterans, the employer would probably come forward with evidence about the difficulty of creating make-up examinations for single individuals who miss the date of the examination, and then the employee might be forced to articulate a different way of going about the process which would allow veterans to stay on track with their co-workers without unnecessarily burdening employers.

Another way in which the disparate impact analysis could take place would be to import the Supreme Court's "reasonable certainty" standard from *McKinney* and *Tilton* but, instead of applying it to the probability that the plaintiff would have been promoted, as the defendants here suggest, to apply it to the probability that the plaintiff would have taken the exam had he not had to serve in the military. This procedure makes sense given the policy behind USERRA—namely, to prevent veterans from falling behind their colleagues due to their veteran status. If a change in their status would have happened while they were away in the army, it should happen once they return. If the veteran would have taken the exam while away, it should be administered to him immediately upon his return. If it is denied to him, then the employer, not the employee, should be charged with the uncertainty associated with the taking of the examination, viz. the employee's score and promotion.

While these kinds of inquiries are unnecessary in Fink's case because the jury has enough evidence from which to infer discriminatory intent under the *NLRB* burden-shifting test, these modes of analysis may, in fact, be the more logically appropriate ways of handling cases like Fink's, some of which will certainly present fact patterns unamenable to the *NLRB* motivation test. The proper and precise way of proceeding in such cases, however, is best left to the discretion of the courts that first encounter them.

(2)

■ Defendants next argue that Fink is not entitled to the liquidated damages that the jury awarded to him because in order to secure liquidated damages under USERRA, the plaintiff must prove that the defendants' actions in breach of USERRA were willful. *See* 38 USC § 4323(d)(C). Proving willfulness is not the same thing as proving the intent to discriminate, as was called for by the *NLRB* framework. USERRA's predecessor, the VRRA, did not contain a liquidated damages provision, and therefore, there is a dearth of caselaw in this Circuit (or any other, for that matter) regarding the interpretation of § 4323(d)(C).

However, the USERRA provision is very similar to § 29 USC § 626(b), a provision allowing liquidated damages for willful violations under the ADEA. *See Satterfield,* 12 F.Supp.2d at 445, n. 5. (noting the similarity of the two provisions); *Spratt v. Guardian Automotive Products, Inc.,* 997 F.Supp. 1138, 1142 (N.D.Ind.1998) (relying on various ADEA cases in support of proposition that liquidated damages conditioned on a finding of willfulness are punitive in nature). The analogous ADEA provision has been interpreted by the Supreme Court and the Second Circuit as requiring a showing that the employer either "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the ADEA." *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 126, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985); *see Reichman v. Bonsignore, Brignati & Mazzotta, P.C.,* 818 F.2d 278, 281 (2d Cir.1987); *McGinty v. State,* 193 F.3d 64, 70 (2d Cir.1999). An employer is liable under this provision when he "wholly disregards the law ... without making any reasonable effort to determine whether the plan he is following would constitute a

violation of the law." *Trans World Airlines, Inc.*, 469 U.S. at 126, 105 S.Ct. at 624.

Defendants argue that "[s]ince there was no evidence of a knowing violation of plaintiff's rights in 1994, there is no basis for [a] finding of willfulness." Def.'s Rep. at 8. However, this formulation implicitly misstates the willfulness standard, smuggling the "reckless disregard" alternative out of the definition. If the defendants mean to suggest that "reckless disregard" is not an appropriate basis for a finding of willfulness, they certainly do not make this argument explicit and cite not as much as a single case in support of this proposition. Moreover, Fink's brief makes mention of the "reckless disregard" standard in discussing the liquidated damages issue, and the defendants do not appear to contest the point in their reply.

In short, even if actual knowledge of USERRA's provisions cannot be imputed to the defendants, "reckless disregard" provides a sufficient basis for a jury to assess liquidated damages in this case, and the facts in evidence permitted a reasonable jury to make such a finding. The comments made to Fink by Samford Smolowitz of the pension department and to John Knox by Sherry Kavaler, the personnel director have already been detailed above and could be described as textbook evidence of reckless disregard. The Eighth Circuit, for example, in *Rademaker v. State of Nebraska,* 906 F.2d 1309 (8th. Cir.1990), confronted a case under the ADEA's liquidated damages provision where the plaintiff did not contend that his employer, the State, had deliberately intended to violate the ADEA in firing him. *See id.* at 1313. Rather, he argued that state officials had acted in reckless disregard of its provisions. *See id.* The evidence that had been available to the jury in support of its finding of willfulness was a statement by one Dale Johnson, the Director of the Department of Public Institutions, where plaintiff was employed, that Johnson "wasn't going to allow a law to

prevent [him] from doing what was best for the State of Nebraska." *Id.* at 1311. In the face of the state's argument that this evidence was insufficient for a jury to have found as it did, the court wrote:

> The standard definition of recklessness is acting without regard to the consequences in the face of a known or obvious risk. Johnson's conduct satisfies these elements. As a threshold matter, we observe that Johnson, as the Director of DPI, had the authority to discharge appellees. The jury could have inferred that his statement accurately reflected the circumstances under which Rademaker and Dittmer were discharged. Next, the warning by Johnson's deputy indicates Johnson's awareness of the risk that his actions would violate the ADEA. Finally, Johnson's statement indicates disregard for the consequences of his actions.

*Id.* at 1313 (citations omitted). Similarly, when Samford Smolowitz told Fink, "[I] don't know nothing about the law," and further, that he "didn't want to hear it" after Fink tried to explain the law to him—and the jury was entitled to believe that both of these statements had been made—Smolowitz, the jury could have found, displayed a specific intent to disregard the law. Defendants' claim that "Mr. Smolowitz's alleged comment itself seems to suggest an unfamiliarity with USERRA," Def.'s Reply at 6, simply ignores the fact that "reckless disregard" is sufficient to constitute willfulness. Sherry Kavaler's alleged statement, "I don't want to hear about any more veteran's bullshit," can also be taken as evidence of reckless disregard.

Additionally, Fink musters in support of the jury's verdict the testimony of Joseph DeMarco, a department personnel director in the area of the civil service administration that he was generally familiar with USERRA, Tr. at 218–19, and the testimony of Thomas Patitucci, Director of the Uniformed and Technical Examining Group of the New York City Department

of Citywide Administrative Services that he knew that employees who had missed examinations due to military service were entitled to make-up examinations. Tr. at 339.

Defendants respond to these various statements by arguing that the statements of Mr. Smolowitz and Ms. Kavaler were made "long after plaintiff was denied the make-up examination in 1994," Def.'s Reply at 6, while the statements of Mr. DeMarco and Mr. Patitucci are irrelevant because there is no evidence that they were in any way involved with the decision to deny Fink his make-up examination. *See id.* However, a reasonable jury was entitled to conclude that the statements of Mr. Smolowitz and Ms. Kavaler reflected their attitudes at the time of the initial discriminatory act as well as during the period of ongoing discriminatory action. A jury, for example, could have concluded from Ms. Kavaler's abrupt "I don't want to hear any *more* of this veteran's bullshit" (emphasis added) response to a seemingly innocent inquiry from John Knox that she had previously heard an abundance of "veteran's bullshit," as she termed it. Similarly, a jury could have concluded that awareness of the existence, if not of the specific content, of USERRA, was not local to Mr. DeMarco and Mr. Patitucci. All of these conclusions could give rise to an inference of reckless disregard.

Supporting this inference was the circumstantial evidence that a make-up was indeed administered-three years late-and that Fink was not provided with appropriate study materials for that make-up. One possible conclusion to draw from these facts was that the defendants were aware of the need to administer a make-up examination but, due to their hostility toward veterans, evidenced by Ms. Kavaler's statement, deliberately delayed the administration of the make-up examination to Fink until such time as the material tested on the old examination had become antiquated and then failed to provide Fink with study materials, all in a calculated attempt

to railroad his application for promotion. Alternatively, the defendants had absolutely no intention of administering the make-up examination until after the Department of Labor interceded on Fink's behalf, at which point the defendants deliberately gave Fink a make-up examination on outdated material. Defendants suggest that Mr. Patitucci's testimony belies this conclusion and establishes that the make-up procedure used in Fink's case was the city's policy, in place since at least 1987. *See* Def.'s Reply at 7. However, this is only one reasonable inference among many possibilities, and it is an inference that in no way explains the city's failure to provide Fink with appropriate study materials for his examination and does not account for the fact that Fink spoke with representatives from the Department of Labor who, in turn, contacted the fire department, prior to the administration of the make-up examination to Fink. The jury may have chosen to make their own inference, one that did account for the study material problem and the Department of Labor intervention and one that was entirely reasonable under the circumstances.

The evidence that the jury had, both of the direct and circumstantial variety, was, therefore, sufficient to have found either conscious or reckless disregard of the provisions of USERRA. The assessment of liquidated damages is consequently upheld.

(3)

Defendants also oppose the award of prejudgment interest. "Under the circumstances of this case," they claim, "an award of pre-judgment interest is not appropriate. There is no clear evidence that defendants' actions were intent upon flouting USERRA." Def.'s Mem. at 7. This formulation is yet another misstatement of the law, erroneously implying that the imposition of prejudgment interest is a punitive measure.

"Prejudgment interest serves to compensate for the loss of use of money due as damages from the time the claim accrues until judgment is entered, thereby achiev-

ing full compensation for the injury those damages are intended to redress." *See* Comment, Prejudgment Interest: Survey and Suggestion, 77 N.W.U.L.Rev. 192 (1982). "The essential rationale for awarding prejudgment interest is to ensure that an injured party is fully compensated for its loss," *City of Milwaukee v. Cement Div., Nat. Gypsum Co.,* 515 U.S. 189, 195, 115 S.Ct. 2091, 2095, 132 L.Ed.2d 148 (1995), and the Supreme Court has "repeatedly stated that prejudgment interest 'is an element of [plaintiff's] complete compensation.'" *Osterneck v. Ernst & Whinney,* 489 U.S. 169, 175, 109 S.Ct. 987, 991, 103 L.Ed.2d 146 (1989) (citation omitted).

The Second Circuit has made clear that

In a suit to enforce a federal right, the question of whether or not to award prejudgment interest is ordinarily left to the discretion of the district court, which is to take into consideration "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court,"

To the extent, however, that the damages awarded to the plaintiff represent compensation for lost wages, "it is ordinarily an abuse of discretion not to include pre-judgment interest."

*Gierlinger v. Gleason,* 160 F.3d 858, 873 (2d Cir.1998) (citations omitted). *See also Sharkey v. Lasmo,* 214 F.3d 371, 375 (2d Cir.2000) ("[W]e have consistently stated that '[t]o the extent ... that the damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion not to include pre-judgment interest.'" (citation omitted)); *Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 145 (2d Cir.1993) ("This Court has held that "it is ordinarily an abuse of discretion not to include pre-judgment interest in a back-pay award." ")

■ "A court may not decline to award interest by reason of a belief that the jury's award is excessively generous." *Sharkey,* 214 F.3d at 375. Furthermore, unlike other circuits, *see, e.g., Gibson v. Mohawk Rubber Co.,* 695 F.2d 1093, 1102 (8th Cir.1982); *O'Donnell v. Georgia Osteopathic Hosp., Inc.,* 748 F.2d 1543, 1552 (11th Cir.1984), the Second Circuit has explicitly held that awarding liquidated damages does not preclude an award of prejudgment interest. *See Reichman,* 818 F.2d at 281. Although *Reichman* was a case decided under the ADEA, it has already been noted that the liquidated damages provision under that statute is very similar to that under USERRA, and there is no meaningful differentiation that can be made between the award of prejudgment interest under the two statutes. The same reasoning that the Second Circuit used in deciding the ADEA case applies to USERRA: while prejudgment interest is compensatory, liquidated damages serve a punitive function. *See id.* at 282. (No interest was awarded on the liquidated damages portion of the award, of course.)

■ In light of these pronouncements, the defendants' claim that Fink should not be awarded prejudgment interest because he has already been awarded $42,000 in compensatory damages for back pay and $8,282,86 per year in pension retroactive to June 1, 1999 ignores the purpose of prejudgment interest in preventing the defendants from enjoying an interest-free loan for as long as it delays paying back wages. *See Clarke v. Frank,* 960 F.2d 1146, 1153–54 (2d Cir.1992). The defendants have identified no particular reason why the award prejudgment interest is inappropriate in this case.

The sole precedent that supports defendants' position is the opinion on the issue of damages in the USERRA case *Chernoff v. Pandick Press, Inc.,* 440 F.Supp. 822 (S.D.N.Y.1977) (not to be confused with the liability opinion in the same case cited above), where the court, after noting, quite innocuously, that the award of prejudgment interest is discretionary in veterans'

reemployment cases—as it is in virtually all employment discrimination cases—goes on to deny prejudgment interest, saying that "Pandick did not flout the statute, but reemployed Chernoff at the seniority level to which it, in good faith, reckoned him to be entitled," *id.* at 827, thereby incorrectly suggesting that the purpose of prejudgment interest is punitive. The court cited no authority in support of this implication, and the only case it did cite on the issue of prejudgment interest in military reemployment situations, *Accardi v. Pennsylvania R. Co.*, 369 F.2d 805 (2d Cir.1966), affirmed a district court's award of prejudgment interest in such a situation despite there having been no indication that anyone had intended to flout the applicable statute.[3] *See id.* at 805.

All in all, on the facts of this case, an award of prejudgment interest on Fink's back pay award is entirely appropriate.

**(4)**

Defendants' next claim is that there is no evidence of retaliation under either USERRA or the ADA. In order to make out a prima facie case of retaliation, a plaintiff must show that (1) he was engaged in protected activity; (2) that the employer was aware of that activity; (3) that the plaintiff suffered an adverse employment action; and (4) that there was a causal connection between the protected activity and the adverse action. *See Galdieri–Ambrosini v. Nat. Realty and Development*, 136 F.3d 276, 291 (2d Cir.1998). The defendants' only contention with respect to the issue of retaliation is that there was no evidence at trial which a jury could have reasonable used to conclude that the decision makers responsible for each of the alleged acts of retaliation knew that Fink had filed charges with the EEOC and the U.S. Department of Labor.

For example, defendants note that Dr. Kerry Kelly, who testified to having made the decision to place Fink on light duty,

also testified that she had no knowledge of the complaints Fink had filed. *See* Tr. at 283. However, this is not strictly accurate. The question Dr. Kelly was asked was "whether or not [she had ultimate authority] to accept or reject the [medical] *board's recommendation* that Fire Marshal Fink be put on light duty." *Id.* (emphasis added). To this question, she responded that she did and that she had decided to accept the board's recommendation. *Id.* But the initiative for the decision to place Fink on light duty was not her own. Further, she testified that the decision to administer a physical is made by the personnel department. *Id.* at 252. A jury could have easily and quite reasonably concluded that the board knew of Fink's complaints after having communicated with the personnel department, even if Dr. Kelly did not.

Defendants also argue that there was no evidence that Michael Vecchi, the official who had been responsible for light duty personnel assigned to the Bureau of Fire Investigation and who had issued a memorandum intended to enforce a light duty policy requiring light duty personnel to work a five-day schedule, *see* Tr. at 442, knew of Fink's EEOC and DOL complaints. But, as Fink points out, "Vecchi did not deny nor explain why almost all of the light duty employees, *with the exception of plaintiff,* were then permitted to work four-day schedules, as evidenced by the time records for light duty employees." *See* Pl.'s Mem. at 9–10 (emphasis in original). Fink testified he did not know of a single other light duty employee who had to work a five-day schedule. *See* Tr. 123–24. And no evidence contradicts Fink's testimony. Considering these circumstances and Michael Vecchi's position as Chief Fire Marshal at the time of the events in question, the jury could have reasonably chosen to conclude that he knew of Fink's discrimination complaints

---

**3.** Of course, even if "flouting the statute" were a necessary prerequisite to the receipt of prejudgment interest, it would not have been

difficult to find such an intent in this case, as the "willfulness" discussion above makes abundantly clear.

when he made the decisions Fink contends were retaliatory.

On top of this, as Fink argues, he testified at trial, without contradiction, that in August, 1998, almost a year after this lawsuit was filed, the defendants filed a "commissioner's application" to involuntarily retire Fink based on his alleged hearing loss. Tr. at 128–29. The retirement application was filed just before the twentieth anniversary of Fink's service, a significant date the passing of which would have resulted in a vesting of his option to receive a $12,000 per year supplement to his pension. Tr. 129–30. The jury could have concluded that the defendants knew of Fink's legal action against them and acted in a retaliatory fashion in response to that action.

### (5)

■ Defendants' fifth contention is that Fink has not made out a case for liability under the ADA. Critically, they claim, Fink has failed in showing that his perceived disability, a hearing loss, disqualified him from a broad class of jobs, as is required under the ADA. This time, the defendants' arguments are misguided in two ways.

The ADA requires the claimant to show that he has-or, as in this case, is regarded as having—a disability, which is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." 42 USC § 12112(a)(A). A major life activity is defined as "functions such as ... seeing, *hearing*, speaking, breathing, learning, and working." 29 CFR § 1630.2(i) (emphasis added); *see also Tubens v. Police Dep't of the City of New York*, 48 F.Supp.2d 412, 417 (S.D.N.Y.1999); *Muller v. Costello*, 187 F.3d 298, 312 (2d Cir.1999).

Assuming that "working" is the major life activity that is subject to a disability here—which, of course, it is not, the claimant must go on to show that he is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i) (1997); *Muller*, 187 F.3d at 312. " 'If the plaintiff establishes only "the inability to perform a single, particular job,' he has failed to establish a substantial impairment to his major life activity of working." ' " *Muller*, 187 F.3d at 312 (citation omitted).

The following factors are relevant in determining whether or not the major life activity of working is substantially impaired:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii) (1997); *Muller*, 187 F.3d at 313. In *Muller*, the plaintiff, a correctional officer, had asthma which, he alleged, prevented him from working as a correctional officer, considering the frequent exposure to cigarette smoke that the job entailed. The court saw this as too narrow a class of jobs to constitute a substantial impairment in the major life activity of working:

Muller argues that his working ability is limited because he is unable to work in any environment where there will be cigarette smoke or environmental irritants. DOCS, in reply, notes that Muller has been employed as a salesman, bank employee, and substitute teacher

during the pendency of this litigation. DOCS also points out that Muller would be qualified to work as a security guard in an office building or as a guard at the smoke-free county jail. Either of these two jobs would fit into a properly defined class of jobs that includes correctional officer because each seems to utilize "similar training, knowledge, skills or abilities" as the position of correctional officer.... [Mueller's] insistence that his class of jobs is limited to correctional officer, compels our holding that there was insufficient evidence before the jury for it to have concluded that Muller was substantially limited in his major life activity of working.

*Id.*

Other courts have held that a disability that precludes piloting an airplane does not substantially impair the major life activity of working because the relevant class of jobs includes ground trainer, flight instructor, and a management or administrative employee of an airline, *see Witter v. Delta Air Lines, Inc.,* 138 F.3d 1366, 1370–71 (11th Cir.1998), an inability to work as a police officer does not impair the major life activity of working, *see Miller v. City of Springfield,* 146 F.3d 612, 615 (8th Cir. 1998), and most significantly, an inability to work as a firefighter does not impair the major life activity of working because firefighting does not constitute a "class of jobs." *Bridges v. City of Bossier,* 92 F.3d 329, 334–36 (5th Cir.1996); *Welsh v. City of Tulsa,* 977 F.2d 1415, 1416–20 (10th Cir.1992).

But the disabilities in these cases are far more local to the positions in question than the disability in this case. For example, the alleged disability at issue in *Welsh* was a "minor residual sensory deficit in the ring and little fingers of [the plaintiff's] right hand," including a decreased sensitivity to hot and cold temperatures, which, according to the City of Tulsa's physician, could "pose a potential risk for self-harm to Welsh if an ember dropped into his glove." *Id.* at 1416. The court appropri-

ately rejected the disability claim, since the disability alleged disqualified the plaintiff from virtually no job with the exception of his current one.

This is a far cry from the hearing impairment that Fink was believed to possess. There is little doubt that a 60% hearing impairment in the right ear and a 74% hearing impairment in the left ear, which the defendants' audiological report on Fink sets forth, *see* Pl.'s Ex. 19G, would disqualify Fink from a large gamut of positions. Although a firefighter position might require unimpaired hearing more than many other positions, Fink was employed as a fire marshal, not as a fire fighter, and there is nothing in particular about employment as a fire marshal which requires unimpaired hearing any more than a whole host of other positions. If the extent of Fink's hearing deficit in the defendants' perception, however inaccurate that perception might have been, was such that he had difficulty hearing ordinary speech emanating from no more than a few feet away from him, and was sufficient, in their minds, to disqualify him from holding a position as a fire marshal, it would have also been sufficient to preclude him from holding a broad class of other jobs where communication is important, and defendants are mistaken in their contention that it would not.

Their second mistake—which is even greater-is to fail to realize that this entire line of argument only applies to cases where the disability alleged is an impairment in the major life activity of working. But here, the disability alleged impairs the major life activity of *hearing.* With the exception of defendants' brief, it is nowhere written or indicated that the plaintiff who bases his claim on a disability or perceived impairment in the major life activity of hearing must prove that this disability disqualifies him from a large class of jobs. All he must prove is that the disability is one that "substantially limits" the major life activity identified. *See Col-*

*well v. Suffolk County Police Dep't*, 158 F.3d 635, 643 (2d Cir.1998).

The EEOC regulations implementing the ADA define "substantially limited" as either:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or
>
> (ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity.

*Id.* (quoting 29 C.F.R. § 1630.2(j)(1)). In Fink's case, the more proper inquiry, of course, is whether the defendants *regarded* him as being substantially limited in either of the two ways described above.

The purpose of the "regarded as" prong of the ADA is to cover individuals "rejected from a job because of the 'myths, fears and stereotypes' associated with disabilities." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 489–90, 119 S.Ct. 2139, 2150, 144 L.Ed.2d 450 (1999) (quoting 29 CFR pt. 1630, App. § 1630.2(l )). The Supreme Court has written that

[t]here are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often "resul[t] from stereotypic assumptions not truly indicative of ... individual ability."

*Id.* at 489, 119 S.Ct. at 2149–50.[4] The fire department's audiological report, which states that Fink had a speech discrimination score of only 28% for speech approximating average conversational speech, *see* Pl.'s Ex. 19G, and testimony by Dr. Kerry Kelly, the Fire Department's chief medical officer, that Fink had difficulty hearing her when she was but a few feet away from him,[5] Tr. at 286, are just two of the pieces

---

4. One might argue that where the ADA claim involves an employer regarding an employee who is not disabled as being disabled and taking an adverse employment action against the employee on that basis, it should not matter whether or not the employer further believes that the employee is "substantially" limited in his activities. Discrimination on the basis of a perceived disability is discrimination, pure and simple, the argument would go, and it is irrelevant how severe that disability is thought to be.

However, both the standard enunciated by the Supreme Court in *Sutton* and set forth above and the actual facts and holding of *Sutton* indicate very clearly that the Supreme Court has taken a different approach. In that case, the ADA claims of plaintiffs who were not hired by an airline because the airline regarded them as being myopic were rejected specifically because their employer, according to the Court, did not regard them as being *substantially* limited in their major life activities: "[c]onsidering the allegations of the

amended complaint in tandem, petitioners have not stated a claim that respondent regards their impairment as substantially limiting their ability to work." *Id.* at 491, 119 S.Ct. at 2150. "When the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Id.*, 119 S.Ct. at 2151. (The major life activity under consideration in *Sutton* was working rather than seeing simply because the plaintiffs had failed to allege that the defendants regarded them as being impaired in their major life activity of seeing. *Id.* at 490, 119 S.Ct. at 2150.)

5. Even if Dr. Kerry's testimony is completely false as far as being a realistic assessment of the extent of Fink's hearing disability, it may still be credited as a perfectly accurate assessment of the extent of the disability Fink was *regarded* as having, which is all that is required to find liability in this case.

of evidence from which a jury could have reasonably concluded that Fink was regarded as substantially limited in the major life activity of hearing. The jury's award of damages under the ADA is, therefore, upheld.

### (6)

 The defendants' final claim is that the weight of the evidence does not support an award of $300,000 in damages for Fink's emotional distress. Remittitur is the "process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial" on damages. *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir.1990) (citation omitted). A jury verdict is excessive if it is so high that it shocks the conscience of the court. *See Lee v. Edwards*, 101 F.3d 805, 808 (2d Cir.1996). To determine whether an award of damages is shockingly excessive, the "court properly may look to the amount of damages awarded to other plaintiffs in cases involving comparable injuries." *Schramm v. Long Island R.R. Co.*, 857 F.Supp. 255, 258 (E.D.N.Y.1994); *See Lee*, 101 F.3d at 812. The goal in this inquiry is not to balance the number of high and low awards and arbitrarily adjust the jury award to reflect a number in the middle of the range but rather, to determine whether the award falls "within [the] reasonable range." *Ismail v. Cohen*, 899 F.2d 183, 187 (2d Cir.1990). Generally, "[i]t is appropriate for a trial court to reduce an award where there is 'sparse evidence with respect to the magnitude and duration of emotional injury or mental distress' in order to guard against awards based on speculation." *Trivedi v. Cooper*, No. 95 Civ.2075, 1996 WL 724743, *7 (S.D.N.Y.1996) (citation omitted). Medical evidence can "lend support to a claim for emotional distress," but "such evidence is neither required nor necessarily probative, though at some level of claimed distress the absence of medical attention may be suggestive." *Miner v. City of Glens Falls*, 999 F.2d 655, 663 (2d Cir.1993).

 The evidence of Fink's emotional distress consists of the testimony of Fink and the testimony of his wife. Fink testimony indicated the substantial manner in which both his image of the fire department and his self-image were affected by the defendants' actions:

Q: Mr. Fink, what has happened to you in the past 6 years, going back now to 1994 when you went to Panama and what has happened to you since you returned and all the things you testified to, how has this affected you in your life?

A: The obvious, all I did was serve my country, our country. I don't expect anything. All I expect is to be treated the same as everybody else when I returned. I thought that maybe the Fire Department, the people I worked with would appreciate the fact that I risked my life for our country for freedom. It brought back a lot of memories for me. I was in Vietnam and I remember coming back from Viet Nam [sic] and being spit at. And I forgot that. I tried to put that behind me. That was many years ago, 30 years ago, and this brought everything back about people not being patriotic; people not being concerned about the country, about treating soldiers this way, soldiers that guaranteed all their rights and everything that we have.

This impacted on me greatly. It disturbed me, something I don't understand, something I have never understood, that people that call themselves American and fly American flags can do this to a soldier. I was being called disabled, sitting in the office with people looking at you like you have 2 heads. I was able to function in the job. I wasn't disabled. I brought the stuff home. I tried to have control over life. As a commander in the military, I controlled the lives of others. I tried to take care of my soldiers and control things and keep them out of harm's way and this is something I couldn't control because ev-

ery time I turned around, I was getting hit with 1 thing or another, saying is this America, how can this be happening here. I brought all the stuff back home and had several fights with my wife and getting upset over small things that I realized I was wrong. Something small would bother me and I would get upset and I found myself apologizing a lot over the last 6 years, realizing I was wrong. I knew I was wrong. This upset me. I couldn't sleep at night. I would wake up in the middle of the night.

I used to love the Fire Department. I loved going out, doing a job, interacting with people, helping people. Then when I started dealing with this bureaucracy in the Fire Department, it was totally different. It wasn't the ones in the Fire Department that go out and save lives and work with the people. These were totally different people. I couldn't believe what was happening. I grew to hate the Fire Department, and I retired very bitterly.

I used to love going to work but the last few years I dreaded going to work. I still went to work every day but I was sick to my stomach. I would be upset, have headaches, get up in the middle of the night. My wife would see me watching television and say why don't you go to sleep, you have to go to work. I wasn't looking forward to going to work. I was looking at being embarrassed like I was disabled, you can't work full-time, full duty fire marshals versus light duty fire marshals. You are not full duty, you are not a full man and it impacted on me greatly. It still bothers me greatly. I'm bothered when I think about it. I'm dismayed. I cannot believe that in this country this can happen to a soldier.

Tr. at 135–37. This testimony was echoed by Fink's wife, who testified that after Fink started to experience problems at work, he became short-tempered, and often, when she woke up in the middle of the night, Fink would not be there. Tr. at 226–27. She would find him reading or watching television. *Id.* at 227. These episodes of anger and sleeplessness would happen three to four times a week. *Id.* As of the time of trial, Fink's wife testified, these episodes persisted. *Id.*

Based on this testimony and his demeanor at trial, I have every reason to assume that Fink came across to the jury, as he did to me, as a credible and sympathetic witness and as a conscientious worker whose work was an essential element of his identity and of his self-esteem and who had been humiliated by the defendants' actions.

The defendants cite multiple cases in support of the proposition that the damages awarded by the jury in this case are shockingly excessive. The cases cited are *Annis v. County of Westchester*, 136 F.3d 239, 248–49 (2d Cir.1998); *Petramale v. Local No. 17 of Laborers' Int'l Union*, 847 F.2d 1009 (2d Cir.1988); *Kim v. Dial Serv. Int'l, Inc.*, No. 96 Civ. 3327, 1997 WL 458783, *12–14 (S.D.N.Y. Aug. 11, 1997), *Tanzini v. Marine Midland Bank*, 978 F.Supp. 70, 78 (N.D.N.Y.1997) and *Binder v. Long Island Lighting Co.*, 847 F.Supp. 1007, 1028, rev'd on other grounds, 57 F.3d 193 (2d Cir.1995). Many of those cases involve emotional distress claims that are substantially or arguably less meritorious than Fink's claim.

For example, *Annis* involved a gender discrimination suit brought by a female police officer, alleging a variety of crude behavior and discriminatory treatment. Nevertheless, the court denied the plaintiff an award for emotional distress because "[s]he has not alleged any physical manifestations of her emotional distress, and despite the discrimination, she remained a lieutenant with the County police." *Id.* at 249. Although Annis testified that she had had counseling, she introduced no affidavits or other corroborating testimony. *See id.* The sole evidence of emotional distress was Annis's own testimony. *See id.* "In short," the court concluded, "her testimony fails to establish that she suffers

from any concrete emotional problems." *Id.* But Fink did introduce testimony to corroborate his claims of emotional distress, viz. that of his wife. In addition, he identified concrete manifestations of his emotional distress: his sleeplessness, headaches, short-temperedness and marital problems and his disenchantment with the fire department and its treatment of him as disabled after he had returned from serving his country, which brought to mind, for him, memories of his treatment after having returned from Vietnam.

In *Petramale,* the plaintiff brought suit against a local union and its officers to challenge discipline allegedly imposed on the basis of his protected speech at a union meeting, which consisted of making accusations against union officials. The jury awarded him $200,000 in compensatory damages for his emotional injuries. The court described the relevant testimony:

> Petramale's sons, Joseph and Steven, both testified that Petramale became very moody and argumentative after his problems with the union began and that these problems eventually led to their parents' marital separation. Although their parents had resumed marital relations, the sons testified that their parents did not get along as well as before the union problems began. Joseph, also a member of Local 17, testified that the other union members, former friends of his father, no longer would speak to his father and heckled him when he tried to speak at union meetings. Petramae's testimony was substantially the same. The incident with the union, according to Petramale, had made him moody and argumentative; he and his wife quarreled about the 'union and everything else'; and this led to their marital problems. Petramale also testified the incident with the union had made him nervous and unable to sleep at night. He did not say when his sleeping problem began nor did he describe its extent. There was no expert medical testimony. Petramale admitted that he never

sought medical treatment for any of his alleged injuries.

*Id.* at 1011–12. The court called this "one of those rare cases in which the compensatory damages awarded are grossly excessive" and reduced the $200,000 award to $100,000. *Id.* at 1013.

In certain ways, the facts in *Petramale* are more egregious than those in this case. Petramale and his wife actually separated for a time, and Fink endured ridicule by his coworkers. In other ways, the facts are quite similar. Notably, the manifestations of emotional distress in both cases are strikingly similar, consisting largely of sleeplessness and marital problems. In both cases, no medical evidence was presented, and neither plaintiff sought medical help. But, in yet other ways, Fink's case is a stronger one. While Petramale does not identify the extent of his sleeplessness, Fink's wife specifically testified that her husband's episodes of anger and sleeplessness would occur three to four times per week. Furthermore, and most significantly, Petramale's emotional distress allegedly stemmed from discipline imposed after a single incident. Fink's emotional distress resulted from a protracted litany of discriminatory acts over the course of a number of years. This difference is significant insofar as the *Petramale* court was able to conclude that "it is unclear how much of [Petramale's] injuries were caused by the illegal punishment as opposed to general problems with the union." *Id.* In Fink's case, no such ambiguity existed. All in all, then, Fink's case appears to be the stronger of the two.

In *Tanzini,* a former Marine Midland Bank employee brought suit against his former employer alleging discrimination under the ADEA, ADA, ERISA and New York Human Rights Law. The evidence of emotional distress in this case consisted of testimony from the plaintiff and his wife. *See id.* at 78. Tanzini testified that he did not leave the house for a week following his termination because he was "in a state of shock," *id.,* and he subsequently en-

dured memory loss, sleepless nights, headaches, nervousness and short-temperedness. *See id.* His wife confirmed this testimony. *See id.* The jury awarded him $200,000 for these injuries. *See id.* at 73. The court, however, reduced the verdict to $30,000, noting that the plaintiff "presented no evidence detailing the duration or magnitude of his emotional injuries, nor any evidence of medical or psychological treatment." *Id.* at 78. But Fink did present evidence detailing the duration and magnitude of his injuries. Moreover, *Tanzini* was decided, for reasons that are irrelevant here, not under the federal "shocks the conscience" standard but under the less deferential New York State standard, which allows courts to overturn an award if it merely "deviates materially from what would be reasonable compensation," which, "in design and operation, influences outcomes by tightening the range of tolerable awards." *Ginsberg v. Valhalla Anesthesia Associates, P.C.*, No. 96 Civ. 6462, 1997 WL 669870, *2 (S.D.N.Y. Oct. 28, 1997).

In *Binder*, an age discrimination case, the emotional distress evidence consisted solely of the plaintiff's own testimony, specifically testimony that "the emotional distress was my inability to support my family" and a few vague allusions to the plaintiff's resentment stemming from the manner in which he was "pushed out the door." *Id.* at 1028. The jury awarded the strangely precise amount of $497,738 on this evidence alone, and the court, finding no basis for this number, reduced the award to $5,000. *See id.* Fink's case, however, is significantly stronger than that of this plaintiff.

In the final case cited by the defendants, *Kim v. Dial Serv. Int'l, Inc.*, the plaintiff brought claims under Title VII, the ADEA, the NYSHRL and the Administrative Code of the City of New York §§ 8–101 et. seq., and prevailed on his race discrimination claim. He was awarded $300,000 in compensatory damages for his emotional distress. *See id.* at *11. The plaintiff and his wife testified at trial. *See id.* at *14. He testified that he felt "gloomy," had difficulty sleeping, lost his appetite and twenty pounds, drank at home and took sedatives. *Id.* His wife testified that the plaintiff lost his interest in social and leisure-oriented activities, a lack of interest that had continued, in a lesser form, to the then-present day. *See id.* After examining awards in a variety of cases, the court reduced the award to $25,000, noting, significantly, that "[m]uch of the testimony regarding mental anguish ... was tied by the plaintiff to the conversations which he contended proved age discrimination. As a consequence, a certain amount of his suffering must be attributed to a theory on which he did not recover." *Id.* at *14. While it is debatable whether Fink's or this plaintiff's case presents a more compelling instance of emotional distress,[6] Kim's case is easily distinguishable because in the case at bar there is no issue as to whether Fink's emotional distress is attributable to the city's and fire department's discriminatory conduct.

Thus, all of the cases cited by the defendant present fact patterns with less merit than Fink's. A number of other cases are worth mentioning here.

In *Carter v. Rosenberg & Estis, P.C.*, No. 95 Civ. 10439, 1998 WL 150491 (S.D.N.Y. Mar. 31, 1998), a jury awarded $75,000 in compensatory damages on a Title VII / NYHRL retaliation claim. *Id.* at *3. The court wrote:

> [The plaintiff] stated only that she was 'very upset,' 'a mess,' and suffered from 'uncontrollable crying.' But she gave no indication, or at least altogether inadequate detail, as to the magnitude, duration, or severity of her mental anguish. In addition, Carter alluded only to extremely minor perceived physical ail-

---

6. Arguably, Fink's case is stronger because, just as in some of the cases examined above,

Kim has not introduced evidence about the extent of his symptoms.

ments (often proven unfounded) that could possibly have been related to either her termination or her mental distress from that event. Most important, Carter offered no testimony that she suffered any of the sorts of serious mental and physical injuries—such as suicidal ideations, heavy drinking, deteriorating family relations, increased blood pressure, and difficulty sleeping—that afflicted the plaintiffs in the preceding cases, and which in any event supported only far smaller awards. Therefore, lacking substantial, specific, and corroborated evidence of the magnitude and duration of Carter's mental anguish, the jury was 'forced to speculate in awarding [her] compensatory damages,' an impermissible basis for an award under all relevant authority.

*Id.* at *24 (citations omitted). Accordingly, the court remitted the award to $15,000. Needless to say, Fink's is a stronger case.

In *Rivera v. Baccarat, Inc.,* 10 F.Supp.2d 318 (S.D.N.Y.1998), vac'd on other grounds by 205 F.3d 1324 (2d Cir. 2000), a plaintiff contended that after being terminated because of her national origin, she has felt nervous, been unable to sleep, has, at times, become anxious at her current job, has had difficulty socializing because she tends to become irritable and depressed and experiences stomach aches because of her anxiety. *Id.* at 330. This testimony was confirmed by her daughters. *Id.* The court reduced the plaintiff's award to $20,000, *see id.* at 332, noting that her termination did not prevent her from engaging in major life activities or securing new employment soon afterwards, that she had sought no counseling or medical attention, preferring to treat her symptoms with nothing more than a herbal remedy, and that although she did once visit a physician who prescribed tranquilizers for her immediately after her termination, "[o]ther factors, including the illness of her mother, also affected Ms. Rivera's emotional well-being in this period." *Id.* at 330. While some of the symp-

toms and the lack of medical evidence in *Rivera* constitute similarities to the case at bar, Fink has presented testimony about the extent of his distress, and there is no alternate source of distress to which any part of his symptoms can be attributed.

In *Trivedi v. Cooper,* No. 95 Civ.2075, 1996 WL 724743 (S.D.N.Y. Dec. 17, 1996), a jury awarded $700,000 for emotional distress to a plaintiff who brought employment discrimination claims under 42 U.S.C. §§ 1981 and 1983. The court reduced the award to $50,000. *See id.* at *8. The court wrote:

The only evidence presented to prove emotional distress was Mr. Trivedi's testimony that he felt he was 'starved of professional growth' and that the discrimination made him feel 'like how a woman would feel if her child were lost.' On the emotional side I felt insulted, I felt indignant, I felt unhappy, I felt emotionally upset.

By way of contrast, Fink identified tangible physical symptoms, noted their extent, had confirmation from his wife and described what he felt with far more specificity and realistic resonance.

In *Lutnick v. New York City Health & Hospitals Corp.,* No. 89 Civ. 4217, 1994 WL 704804 (S.D.N.Y. Dec. 16, 1994), a Federal Rehabilitation Act claimant was awarded $36,056 in unspecified compensatory damages, some significant portion of which was attributable to emotional distress. *See id.* at *3–4. The plaintiff's testimony included references to "suicidal ideations" and "depression [that] stemmed in part from having no relief or distraction from her physical discomfort." The court upheld the award, although the plaintiff could identify no physical symptoms and provided no testimony about the extent of her depression.

In *McIntosh v. Irving Trust Co.,* 887 F.Supp. 662 (S.D.N.Y.1995), a jury awarded $219,428 in compensatory damages for emotional distress stemming from an employer's termination of an employee in re-

taliation for the latter's race discrimination complaints. *Id.* at 663. The evidence at trial consisted solely of the plaintiff's own testimony, wherein he testified to having felt "humiliated" during a meeting when his supervisor "interrogated" him, "shocked" and "angry" when he was given an unwarranted reprimand and "like dirt" when he was humiliated and embarrassed in front of the rest of his department. *Id.* at 664. Any physical manifestations of his distress were short-lived. *See id.* The plaintiff stayed home for several days and "saw a doctor once because of ailments related to nervous tension—he felt weakness in his legs, had stomach cramps, had chest pains and felt 'beaten down' mentally." *Id.* The plaintiff further testified that he had felt "devastated," "angry" and "depressed" upon his termination and that he avoided his family at holidays because of his embarrassment and shame. *Id.* He felt inadequate because his wife had to support him. *Id.* However, the plaintiff introduced no medical evidence and "such sparse evidence with respect to the magnitude and duration of any emotional injury or mental distress that he sustained, [that] the jury was forced to speculate in awarding him compensatory damages." *Id.* at 665. Accordingly, the court reduced the award to $20,000. *See id.* at 669.

In a suit brought by an African American corrections officer under 42 U.S.C. §§ 1981, 1983 and Title VII, alleging a failure to promote, discriminatory job assignments, unjustified disciplinary sanctions and public embarrassment, as well as racial harassment, the Second Circuit upheld the district court's determination that a $50,000 award did not shock the judicial conscience. *Wade v. Orange County Sheriff's Office,* 844 F.2d 951, 955 (2d Cir.1988) ("There was evidence to support the view that appellants' actions repeatedly subjected Wade to humiliation at work and that their racially motivated harassment included imposing on him an unwarranted disciplinary sanction on the basis of a false charge by McLean, and causing the sanction to be reported in a countywide newspaper, thereby causing Wade unjustified public embarrassment.")

In *Broome v. Biondi,* 17 F.Supp.2d 211 (S.D.N.Y.1997), a jury awarded $114,000 each in emotional distress damages to two tenants whose application to sublease a cooperative apartment was rejected on the basis of race. *See id.* at 223. The plaintiff testified to having felt "embarrassed and humiliated by the entire approval process and the ultimate denial of [the] sublet application." *Id.* She noted feeling "as if she were experience her 'worst nightmare' and being 'reduced to tears' during a cooperative board interview and again when she heard that the application had been rejected." *Id.* Her husband, also a plaintiff, testified that he felt "angry" and "demoralized" by the manner in which his wife had been treated, was angry at himself for not defending himself or his wife at the board meeting and lost confidence at work, fearing that "clients would somehow not trust [his] advice after they met [him]." *Id.* Both plaintiffs had to pass by the cooperative on a daily basis and were, therefore, reminded of their emotional pain each day. *See id.* Although there was no tangible injury and no medical evidence, the court upheld these awards, relying largely on employment discrimination awards in reaching this determination. *See id.* at 224–25.

In *Ginsberg v. Valhalla Anesthesia Associates, P.C.,* No. 96 Civ. 6462, 1997 WL 669870 (S.D.N.Y. Oct. 28, 1997), a pregnancy discrimination case, a court reduced the jury's compensatory award for emotional distress from $400,000 to $100,000, distinguishing this case from those cases where awards in the $20,000 to $50,000 range were appropriate by the presence of medical evidence: "[w]hile plaintiff presented little evidence regarding her emotional distress, she did testify that she saw a psychiatrist and received anti-depressant medication and remained on medication for close to a year." *Id.* at *4. It is worth noting, however, that *Ginsberg* was decid-

ed under the less deferential New York State standard.

Awards in a higher range usually involved circumstances far more egregious than those in this case. *New York City Transit Auth. v. State Div. of Human Rights*, 181 A.D.2d 891, 185 A.D.2d 889, 581 N.Y.S.2d 426 (2d Dep't), where the court upheld a $450,000 jury award for emotional distress, for example, involved "the most shocking instance of abuse of an employee by an employer" that the hearing judge had seen in his twenty-year experience with the Division of Human Rights and left the court at a loss to find any other New York case involving "the type of prolonged, intentional sex discrimination committed by the NYCTA in this case, or any case where the magnitude of the psychic injury was comparable to that suffered by the complainant." *Id.* at 581, 581 N.Y.S.2d at 429. *Shea v. Icelandair*, 925 F.Supp. 1014 (S.D.N.Y.1996), where the court reduced a $250,000 jury award to $175,000 in an age discrimination case brought under the HRL, involved expert medical testimony that the emotional distress caused by the discriminatory acts there in question aggravated symptoms of the plaintiff's Parkinson's disease and caused cardiac symptoms and had an effect on his day-to-day living. *Id.* at 1024–25. In *Nairn v. Nat'l R.R. Passenger Corp.*, 837 F.2d 565 (2d Cir.1988), where the court overturned an award of $400,000 and suggested that one in the neighbor-

hood of $300,000 would be more appropriate, actual physical injuries were involved, including spinal disc degeneration and a 15% impairment of back function. *See id.* at 567.

When all these cases are taken together, it is safe to say that Fink's emotional distress claim is more meritorious than those in the low $20,000 to $50,000 range, specifying, as it does, the frequency of Fink's symptoms and noting, with great specificity, the etiology of Fink's emotional distress, which persisted over the course of years and was ongoing as of the date of his wife's testimony. Fink's disenchantment with the fire department and his job, both of which he came to hate, aggravated by the memory of his experience of his reception upon returning from Vietnam and exacerbated by the fire department's placing him on light duty after subjecting him to medical testing because of his alleged disability all compound his emotional injuries, lending credence to the claims of diminished self-worth and public humiliation which Fink's testimony suggested. However, Fink did not seek medical help for his problems and presented no medical evidence,[7] and although his case involved physical symptoms (sleeplessness, headaches and short-temperedness) that resulted in marital problems, his symptoms were not as horrifying as some of those in the highest range of awards. On this evidence, and in light of cases such as *Annis* and *Broome*, both of which allow awards in

7. The fact that Fink did not go to a psychiatrist when he experienced the symptoms of emotional distress to which he testified, an omission to which courts often seem to give significant weight, should not necessarily have led either a jury or this court to conclude that his symptoms were somehow more likely to be fabricated or insignificant. As indicated above, the Second Circuit has written that medical evidence is not "necessarily probative," and its absence is only suggestive "at some level of claimed distress." *Miner*, 999 F.2d at 663. What that level of "claimed distress" is varies and may depend in great part on the personality, life experience, cultural heritage and work environment of the individual claimant. It is not unreasonable to suppose that an individual such as Fink, a man used to working among men in the military and in the fire department, who had served his country in Vietnam and been recommended for an exemplary rating in the fire department, in part, for not having gone on sick leave for three years, would not, to use evocative phraseology, have gone "running off to some shrink," and endured the stigma often associated with such visits in some circles, upon experiencing symptoms that were psychological in origin after having been subjected to "a little employment discrimination." On these facts, therefore, the absence of medical evidence should not be weighted too heavily against Fink.

the neighborhood of and, in the case of *Broome,* in excess of $100,000 on evidence that is arguably much weaker than the evidence here, an award of $125,000 would be the maximum that would compensate Fink for his injuries without shocking the judicial conscience. Therefore, a new trial will be held on the issue of damages unless Fink accepts a $175,000 remittur.[8]

### Conclusion

The defendants are liable under USERRA because a jury could have found their conduct to be discriminatory under the *NLRB* framework, and the jury's verdict is upheld insofar as it is premised on liability under USERRA. The award of liquidated damages under USERRA is upheld because the jury could have found the defendants' conduct to be in either conscious or reckless disregard of the provisions of USERRA. The award of prejudgment interest is upheld, as it is a part of Fink's full back-pay compensation. The damages awarded as a result of defendants' retaliatory conduct were appropriate because there was ample evidence of retaliation, and the jury could have concluded that the defendants knew of Fink's legal action against them and acted in a retaliatory fashion in response to that action. The jury's award of damages under the ADA is upheld because there was sufficient evidence for a jury to have concluded that the defendants discriminated against Fink on the basis of a perceived disability, viz. a hearing loss. Finally, a new trial is granted on the issue of emotional damages alone unless, within twenty days of the filing of this order, Fink files with this

court a statement accepting a remittur in the amount of $175,000.

SO ORDERED.

---

8. The previous reduction of Fink's award from $800,000 to $300,000 due to the statutory damages cap is not a factor in this determination. The Second Circuit has clearly stated that:

> Nothing in the language of the statute suggests that the cap on damages is intended to diminish the jury's role in assessing punitive damages or to alter the standard for judicial review of such awards. The legislative history of the provision confirms that it is not meant to exert upward or downward

pressure on the size of jury awards. Rather, the purpose of the cap is to deter frivolous lawsuits and protect employers from financial ruin as a result of unusually large awards. The statutory limitation is not an endpoint of a scale according to which judges might recalibrate jury awards.

*Luciano v. Olsten Corp.,* 110 F.3d 210, 221 (1997). Even after an award has been reduced as per the cap, the regular "shocks the judicial conscience" standard applies to judicial review of a jury award. *See id.*